Nilsa ORTIZ, John Peek, Annie Mae Revelle, Marcinda Jackson, and Denise Trader, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Thomas P. EICHLER, in his official capacity as Secretary of the Delaware Department of Health and Social Services, and Phyllis T. Hazel, in her official capacity as Director of the Department's Division of Economic Services, Defendants.

Civ. A. No. 84–16 MMS.

United States District Court,
D. Delaware.

July 5, 1985.

Anne M. Perillo, Community Legal Aid Soc., Inc., Wilmington, Del., for plaintiffs.

Margaret S. Proctor, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

The six named plaintiffs in this proposed class action challenge the procedures used by the Division of Economic Services of the Delaware Department of Health and Social Services ("DES") relating to three forms of federal public assistance: Aid to Families with Dependent Children ("AFDC"), Food Stamps, and Medicaid. Specifically, they complain that defendants have acted unlawfully in two areas: 1) notification of public assistance claimants of adverse action and 2) conduct of administrative hearings regarding the eligibility of persons for public assistance. Named as defendants are Thomas Eichler, in his official capacity as Secretary of the Delaware Department of Health and Social Services, and Phyllis T. Hazel, in her official capacity as Acting Director of DES.[1]

Plaintiffs allege the practices employed by DES in providing notice and a hearing before reducing or terminating public as-

---

1. The original named defendants were Patricia Schramm and Charles Hayward, the predecessors of defendants Eichler and Hazel. Plaintiffs substituted the current defendants by stipulation pursuant to Fed.R.Civ.P. 25(d)(1). Docket Item ("D.I.") 58.

sistance benefits violate plaintiffs' procedural rights under the pertinent federal regulations and the United States and Delaware Constitutions. In particular, plaintiffs complain that DES employees have considered hearsay evidence and evidence not in the record, failed to provide plaintiffs with timely and adequate notice, initiated and considered *ex parte* communications, failed to issue decisions that explain the reasons for the determination and the evidence relied upon, and failed to provide an impartial decisionmaker.

Upon completion of discovery, plaintiffs filed motions for class certification and for summary judgment. For the reasons stated below, the motion for class certification will be granted, and the motion for summary judgment will be granted in part and denied in part.

## I. Facts

### A. Fair Hearings Procedures

The relevant facts are either undisputed or, where disputed, are set forth in the light most favorable to the defendants, the party opposing the motion. The three federal programs at issue—AFDC, Medicaid, and Food Stamps—were established by federal law to provide financial, medical, and nutritional assistance to low-income persons. As part of their duties to administer these programs, the Secretaries of the Department of Health and Human Services and the Department of Agriculture have promulgated detailed regulations that specify eligibility criteria for these programs and set forth various requirements for how claims are to be processed. *See* 7 C.F.R. §§ 271–85 (1985); 42 C.F.R. §§ 430–56 (1984); 45 C.F.R. §§ 201–82 (1984).

The administrative burden of determining which persons are eligible for these programs falls on the states. Each state must formulate a plan for administering each program and submit it to the appropriate federal agency for approval. As part of its plan, the state must "provide for granting an opportunity for a fair hearing before the State agency to any individual

whose claim for [benefits] is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 602(a)(4); *see also* 42 U.S.C. § 1396a(a)(3); 7 U.S.C. § 2020(e)(10); *cf.* 7 U.S.C. § 2015(b)(2). The Secretary responsible for each program has promulgated regulations specifying the minimum fair hearing rights that each state, through its plan, must afford individuals. *See* 7 C.F.R. § 273.15–.16; 42 C.F.R. § 431.-200–.246; 45 C.F.R. § 205.10. Although the language of the regulations for each act differs in many respects, the basic procedural rights afforded to claimants are virtually identical, except that persons charged with intentional violations of the Food Stamp program are afforded some additional rights, presumably because intentional program violators are subject to punitive measures. *Compare* 7 C.F.R. § 273.15 *with* 7 C.F.R. § 273.16.

In Delaware, a DES caseworker makes the initial decision to deny an application for public assistance benefits or to reduce or terminate existing benefits. Any person[2] whose application for benefits is denied or whose existing benefits are reduced or terminated is entitled to written notice of the agency action and an opportunity for a fair hearing. *See* DES Economic Services Policy Manual, D.I. 57, §§ 5000–5201 (hereinafter "DES Manual"). The method chosen by Delaware and DES to provide fair hearings involves two stages. First, the claimant appears at an evidentiary hearing before a State Hearing Officer who administers oaths and controls the conduct of the hearing. The agency caseworker puts forward the reasons why he or she made the initial decision to deny, reduce, or terminate benefits, along with any evidence that supports the decision. The claimant, along with his or her representative, has an opportunity to present his or her case, including supporting evidence. Also present at the hearing is the State Hearing Representative, whose role is the subject of some dispute between the parties and who will be discussed at length

---

2. Persons receiving benefits and persons applying for benefits will be referred to individually as "recipients" and "applicants" and collectively as "claimants."

below. It is undisputed, however, that the Hearing Representative prepares a recommended hearing decision and submits it, a draft decision letter, and the hearing record to the Director of DES, but not to the claimant.[3] At the second level of the decision making process, the Director reviews these materials and either accepts or rejects the recommended decision. In the latter case, the decision letter is returned to the Hearing Representative for redrafting. When the decision letter is satisfactory to the Director, he or she signs it and sends it to the claimant. This letter represents the final decision of the state agency with no further right of appeal at the administrative level. Claimants can appeal decisions "result[ing] in financial harm to the appellant" within thirty days to the state Superior Court, which will sustain the agency's decision if it is supported by substantial evidence on the record. 31 *Del.C.* § 520 (1984 Supp.) (effective September 29, 1984).

## B. The Named Plaintiffs' Cases

The named plaintiffs all were adversely affected by DES decisions, applied for and were granted hearings, and received adverse decisions from the agency. Plaintiff Nilsa Ortiz received $75 per month in Food Stamps until September 30, 1983. When she applied for recertification, as is periodically required, her Food Stamps allotment was reduced to $24 per month commencing in October, 1983. The issue at her hearing was whether Ms. Ortiz customarily purchased and prepared food in common with her boyfriend, who earned some income. After the hearing, the Hearing Representative recommended reversing the claims worker's decision to reduce her benefits because he found that Ms. Ortiz did not customarily purchase and prepare food with her boyfriend. Upon receiving this recommendation, the Director asked Ms. Ortiz's case supervisor for more informa-

tion and looked at her case file, which contained some documents that were not part of the hearing record. Appendix ("A"), D.I. 47A, at 11–12. The Director also had conversations about Ms. Ortiz's case with the Hearing Representative, Hearing Officer, and DES Program Administrator. Ms. Ortiz was never informed that the Director looked at her case file and had these conversations, nor was she sent a copy of the recommended decision. On December 12, 1983, the Director informed Ms. Ortiz by letter that the caseworker's decision setting her Food Stamps benefits at $24 per month was affirmed.

Plaintiff John Peek received notice in October, 1983, that an administrative disqualification hearing had been scheduled concerning his $75 monthly Food Stamps allotment because he had allegedly filed a false application. At the hearing, Mr. Peek testified and explained that his failure to include certain information was unintentional. Several applications filed by Mr. Peek were admitted into evidence, although the interviewers for the applications were not present. In the course of making his decision, the Hearing Representative examined a Quality Control Report prepared by a person who was not present at the hearing,[4] but did not rely on this report. A–102–103. The Hearing Representative recommended that Mr. Peek be disqualified for six months. The Director accepted this recommendation and sent Mr. Peek a final decision letter stating in pertinent part: "You are disqualified from participation in the Food Stamp Program for six (6) months beginning January 1984. At a hearing on December 2, 1983, which you attended, a determination was made that you intentionally violated program rules by providing false, misleading information concerning income from employment." A–140.

---

**3.** At oral argument, defendants' counsel stated that claimants now receive recommended decisions, but did not introduce evidence into the record to support this statement.

**4.** The parties dispute whether or not this report was admitted into evidence at the hearing. This

factual dispute cannot be resolved at this stage, as the record is not clear on this point. *See* A–101–103. It is clear, however, that the Hearing Representative examined this report in the course of making his decision. *Id.*

The third plaintiff, Annie Mae Revelle, had a hearing to determine "whether she owed DES for an overpayment of AFDC and Medicaid benefits that were made to her grandson Rasheen between August 1982 and June 1983." Complaint, ¶ 21a; *see* Answer, ¶ 21a. Ms. Revelle's counsel presented several legal arguments at the hearing concerning the alleged overpayment. The text of the final decision of the Director states, in its entirety:

The decision of the Division of Economic Services to file a claim for repayment of benefits paid under the Aid to Families with Dependent Children (AFDC) Program on behalf of your grandchild, Rasheen Revelle, is affirmed.

Based on the information presented at your Fair Hearing, I find that the agency is required to collect any overpayment, regardless of its cause. The rules concerning overpayments are found at Section 7000 of the Economic Services Manual.

Inquiries about this decision may be made to Roger Waters, State Hearing Representative, at 421–6153.

A–141. Ms. Revelle allegedly still does not know whether the Medicaid overpayment is owed.

Plaintiff Marcinda Jackson requested a fair hearing after being notified "that she was being terminated from AFDC for allegedly failing to cooperate with the Bureau of Child Support." Complaint ¶ 22b; *see* Answer, ¶ 22b. The fair hearing summary prepared by the caseworker in advance of the hearing indicates that Ms. Jackson was losing her AFDC benefits because she was not being cooperative in identifying the father of her child. A–124. One issue that arose for the first time at the hearing was whether Ms. Jackson had cooperated in having a blood test taken. In addition, two documents were accepted into evidence: a letter from the Clerk of the Family Court with attached correspondence between the Clerk and Ms. Jackson, which included handwritten notes of conversations between the Clerk and Ms. Jackson; and a document prepared by Bureau of Child Support personnel containing statements made by Ms. Jackson. The authors

of these documents were not present at the hearing for cross-examination. Finally, the Hearing Representative spoke to the Family Court Clerk and to Ms. Jackson's caseworker before the hearing, but Ms. Jackson was not told of these conversations. After the hearing, the Hearing Representative prepared a recommended decision stating that the agency's decision to terminate AFDC benefits should be affirmed. The Director accepted this recommendation and notified Ms. Jackson of his decision by letter, which stated in pertinent part:

Based on the evidence and testimony presented at your Fair Hearing, I find that you failed to cooperate with the Bureau of Child Support Enforcement and with The Family Court in establishing paternity for a child in your care. Specifically I find that you failed to arrange for a blood test and that you provided contradictory information to the Court and to the Bureau concerning the paternity of this child.

A–132.

The fifth named plaintiff, Denise Trader, requested a hearing to contest DES's decision to terminate her AFDC benefits for failure to cooperate with the Bureau of Child Support Enforcement ("BCSE"). Two documents were admitted into evidence that were authored by persons not present at the hearing: a letter from a Delaware State Police detective indicating the findings of a polygraph examination taken by Ms. Trader, and a document prepared by BCSE personnel. The Hearing Representative found that the letter was hearsay and did not rely on it. He recommended that the initial decision be reversed and that Ms. Trader's benefits be reinstated. The Director subsequently had *ex parte* conversations with six persons before deciding to affirm the initial decision terminating Ms. Trader's AFDC benefits. The decision letter states, in pertinent part:

Based on a notice of non-cooperation received from the Bureau of Child Support Enforcement and on the results of a polygraph I find that you failed to meet the cooperation requirements at Section 3214 of the Economic Services Manual

and that your needs may not be included in the determination to grant assistance. A–154.

The final named plaintiff, Marsha Curtis, requested a fair hearing to contest the decision to terminate her AFDC, Medicaid, and Food Stamp benefits for failure to provide the name of a protective payee.[5] The issue at the hearing was whether Ms. Curtis had failed to cooperate with BCSE. Although no BCSE representative was present at the hearing, an official notice from BCSE was admitted into evidence. After the hearing, the Hearing Representative had *ex parte* conversations about Ms. Curtis' case with at least one person not present at the hearing. The Hearing Representative recommended affirming the termination of Ms. Curtis' benefits, and the Director agreed. His decision cited no regulations supporting the decision, made no mention of some of the arguments advanced by plaintiff, and failed to cite any specific factual findings in support of his decision. The decision states, in pertinent part:

> The decision of the Division of Economic Services to terminate your benefits under [AFDC] for failure to cooperate with [BCSE] and failure to select a protective payee is affirmed.
>
> Based on the evidence and testimony presented at your Fair Hearing, I find that you provided conflicting information to the Division and to [BCSE] about your living arrangements, and I find that you did not select a protective payee for your AFDC grant.

A–132.

## II. Plaintiffs' Motion for Class Certification

Plaintiffs seek certification of a class consisting of the following individuals:

> [A]ll applicants for and recipients of public assistance benefits administered by DES who since 1982 have had or will have questions concerning their eligibility for these benefits determined at administrative hearings.

5. A "protective payee" is a person who receives public assistance payments on behalf of another

Complaint, ¶ 13. In order for a class to be certified under Fed.R.Civ.P. 23, the party seeking class certification bears the burden of demonstrating that the four requirements of Rule 23(a) are met and that one section of Rule 23(b) is satisfied. *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 689 (E.D.Pa. 1977); *Hehir v. Shell Oil Co.*, 72 F.R.D. 18 (D.Mass.1976). Rule 23 provides, in pertinent part:

> **(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> **(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> . . . .
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . .

These requirements will be considered in turn.

### A. Numerosity

 The numerosity requirement of Rule 23(a)(1) is easily met in this case. In 1982 and 1983 alone, DES conducted 469 administrative hearings; moreover, in response to plaintiffs' request for production of all hearing decisions issued between January 1, 1982, and the present, defendants produced 559 letters. Although the number of hearings may not exactly equal the number of persons in the class, due to possible duplications, the number of persons is large enough to support a finding

person.

of numerosity. The numbers involved in this case compare favorably with the number of class members in other cases in which class certification was granted. *See, e.g., Weiss v. York Hospital*, 745 F.2d 786, 808 (3d Cir.1984) (92 members), *cert. denied,* —— U.S. ——, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 95 F.R.D. 168, 174 (D.Del.1982) (up to 96 members); *Hannigan v. Aydin Corp.*, 76 F.R.D. 502, 510 (E.D.Pa.1977) (more than 75 members); *Horn v. Associated Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir.1977) (48 class members).

■ In response to plaintiffs' showing of numerosity, defendants make two arguments. First, defendants contend that, pursuant to Rule 23(c)(4), the class should be divided into subclasses which correspond to the different kinds of benefits claimed by class members. Second, defendants contend that the class is not numerous because a small number of claimants were allegedly harmed by some of defendants' practices.

Rule 23(c)(4) provides that a court should divide a class into subclasses "[w]hen appropriate" and that the resulting subclasses are considered separate classes, each of which must meet Rule 23's requirements. The usual situation requiring subdivision is "[w]here a class is found to include subclasses divergent in interest." Fed.R. Civ.P. 23(c)(4), advisory committee note; *see* 7A C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1790, at 189 (1972). Defendants do not contend, nor does the Court find, that any divergent interests exist among class members who claim different types of benefits. Indeed, as counsel for defendants readily admitted at oral argument, the hearing procedures used by DES to consider all kinds of benefits are identical, and the federal regulations mandating hearing procedures for AFDC, Medicaid, and Food Stamps claimants are virtually identical with respect to plaintiffs' claims. "[A] class need not be subdivided merely because different groups within it have alternative legal theories for recovery," 7A C. Wright & A. Miller, *supra,* § 1790, at 190, especially when the differences between those legal theories—i.e., the differences in the hearings regulations for AFDC, Medicaid, and Food Stamps—are insubstantial.

Moreover, all class members also allege that the state hearings procedures violate the Due Process Clause, and due process requirements do not vary according to which type of benefits are claimed. It follows that splitting the class into subclasses would serve no useful purpose, as no relevant differences exist between Medicaid, AFDC and Food Stamps claimants for purposes of this case. *See Buckhanon v. Percy*, 533 F.Supp. 822, 829 (E.D.Wis.1982), *modified on other grounds*, 708 F.2d 1209 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1281, 79 L.Ed.2d 684 (1984); *Like v. Carter*, 448 F.2d 798, 800 (8th Cir.1971), *cert. denied*, 405 U.S. 1045, 92 S.Ct. 1309, 31 L.Ed.2d 588 (1972).

Defendants' second argument—that a finding of numerosity is undercut by plaintiffs' identification of a small number of class members affected by some of defendants' practices—is also unpersuasive. Rule 23(a)(1) requires that the defined class be numerous, not that each aspect of defendants' conduct must harm a sufficiently large number of class members. The thrust of defendants' argument seems to be that the Court should split the class into subclasses according to which aspect of defendants' conduct affected which recipient. Division into subclasses on this basis is clearly inappropriate.

### B. Commonality

Plaintiffs have alleged, and defendants have recognized, that common questions of law exist, such as the question whether defendants' notices and final decision letters comport with the applicable regulations and constitutional due process. By the plain language of the rule, plaintiffs need only show that common questions of law *or* fact exist. Fed.R.Civ.P. 23(a)(2); *see Steiner v. Equimark Corp.*, 96 F.R.D. 603, 608 (W.D.Pa.1983); *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 691 (E.D.Pa.1977). Defendants argue, however, that the facts

of the individual class members' cases differ greatly, and that the existence of the common legal questions depends upon the facts of the individual cases.

The majority of the courts that have been faced with this issue have held that differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law. *See Like v. Carter*, 448 F.2d 798 (8th Cir.1971), *cert. denied*, 405 U.S. 1045, 92 S.Ct. 1309, 31 L.Ed.2d 588 (1972); *Steiner v. Equimark Corp.*, 96 F.R.D. at 608; *Cohen v. Uniroyal, Inc.*, 77 F.R.D. at 690–91; *cf. Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979) ("It is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue."). An analogous situation was presented in *Cohen, supra*, where plaintiff sought to certify a class of " 'all who purchased Uniroyal securities who sustained loss between December 1, 1972 and November 15, 1975.' " *Cohen*, 77 F.R.D. at 688. Plaintiff Cohen alleged that the class members had been defrauded by defendants' misrepresentations. Defendants contended that commonality was absent because the class members may have received different misrepresentations at different times. The court found that the fluctuations in the underlying facts during the class period and between class members did not defeat commonality, because class members shared the common legal question of whether defendants' course of conduct was fraudulent. 77 F.R.D. at 691. Similarly, in *Like v. Carter, supra*, the Eighth Circuit Court of Appeals held that a district court abused its discretion by failing to certify as a class action a challenge to delays in processing public assistance applications, even though the extent of the delay varied from applicant to applicant. As the court stated, "[f]actual differences are not fatal if common questions of law exist." 448 F.2d at 802.

■ These rulings indicate that the factual differences in this case are insufficient to compel a denial of class action status. Plaintiffs seek to prove that defendants have engaged in certain practices in issuing notices, conducting hearings, and ruling after the hearings. Plaintiffs do not seek to relitigate each class member's claim; instead, they will use examples from the cases of class members to show that the alleged patterns or practices actually exist. While the factual patterns give rise to the common questions of law, the facts of individual cases have no separate significance. Moreover, judicial economy is served by adjudicating the legal questions raised by defendants' conduct in one action, rather than having each class member petition the court to find facts and decide questions of law. In sum, the Court finds that common questions of law exist and that Rule 23(a)(2) is satisfied.

### C. Typicality

■ In order for a class action to be certified, Rule 23(a)(3) requires "the claims ... of the representative parties [to be] typical of the claims ... of the class." On one level, the claims of the named plaintiffs are certainly typical, because they all received notices from DES of adverse action, all requested and were granted hearings, and all received adverse decision letters from the Director. On another level, however, the named plaintiffs' cases are factually diverse. Their claims differ slightly because they were allegedly harmed by various types of defendants' conduct. As both parties agree, dissimilarities in the facts surrounding the class members do not preclude a finding of typicality. *See Cohen v. Uniroyal, Inc.*, 77 F.R.D. at 691–92; *Steiner v. Equimark Corp.*, 96 F.R.D. at 609. Indeed, in this case, the fact that the six named plaintiffs' cases involve different facts is a virtue, because the plaintiff class alleges that defendants committed several different procedural violations. Absent the existence of some unlucky claimant who was the victim of every wrong that defendants are alleged to have committed, a mix of named plaintiffs, with varying backgrounds, is needed to comprise an appropriately typical class representative. The six named plaintiffs' claims,

taken together, are typical of the class, and Rule 23(a)(3) is satisfied.

One substantial problem raised by defendants in a different section of their brief warrants discussion under this heading. Although the class is composed of both applicants and recipients, none of the named plaintiffs appears to be properly classifiable as an applicant.[6] The question this deficiency raises is whether applicants are properly within the class or, more specifically, whether the named plaintiffs are typical and properly representative of a class that contains applicants.

The typicality requirement is closely related both to the common question requirement of Rule 23(a)(2) and the adequacy of representation requirement of Rule 23(a)(4). *See Cohen v. Uniroyal, Inc.*, 77 F.R.D. at 691; 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.06-2 (2d ed. 1984). The basic goal of the typicality requirement is to examine whether the claims of the class representatives have essential characteristics in common with the claims of class members. *Id.* at 23–191–92; *see also Piel v. National Semiconductor Corp.*, 86 F.R.D. 357, 371 (E.D.Pa.1980) ("although issues exist that digress uncommonly or atypically . . ., the crux of the claims are typical with one another"); *Steiner v. Equimark Corp.*, 96 F.R.D. at 609 ("the class representative's claims are typical when the 'essence' of the allegations concerning liability, and not the particulars, are sufficiently similar to those of the other class members"). As the Supreme Court has described the typicality requirement, " 'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.' *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 [97 S.Ct. 1891, 1896, 52

L.Ed.2d 453 (1977) ] (quoting *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216 [94 S.Ct. 2925, 2929, 41 L.Ed.2d 706 (1974) ])." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982).

Applying this standard, courts have certified class actions with class representatives whose personal characteristics were not identical to the characteristics of some class members, as long as the essence of their claims were in common. For example, in *Almenares v. Wyman*, 453 F.2d 1075 (2d Cir.1971), *cert. denied*, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972), three AFDC recipients were certified to represent a class composed of recipients of AFDC benefits and recipients of Aid to the Aged, Blind and Disabled ("AABD"), because "the district court found plaintiffs representative of recipients in [AABD]," and because the same hearing regulations applied equally to both programs. *Id.* at 1080 n. 7. Similarly, in *Like v. Carter*, 448 F.2d 798 (8th Cir.1971), *cert. denied*, 405 U.S. 1045, 92 S.Ct. 1309, 31 L.Ed.2d 588 (1972), the Eighth Circuit Court of Appeals found that the typicality requirement was met by two named plaintiffs, applicants for AFDC and Old Age Assistance, who represented a class of all public assistance applicants, including applicants for other types of public assistance. *Id.* at 800–02.

■ These cases, taken together, stand for the proposition that class representatives are typical of the class if they have all the characteristics essential to the claims of the class, even if they do not have some characteristics possessed by some class members. The crucial point is whether any differences that exist between the class representatives and the class members are

---

**6.** In her April 15, 1985 letter to the Court, plaintiffs' counsel contends that named plaintiff Nilsa Ortiz is an "applicant" for purposes of this case because Ms. Ortiz's hearing concerned DES's action on her application for recertification for Food Stamps. The recertification process, however, is different than the initial application process, *compare* 7 C.F.R. § 273.14 *with* 7 C.F.R. § 273.2, and a person already receiving benefits—as Ms. Ortiz was—is situated different-

ly than one who is filing an initial application for benefits. An example of this difference is that the complaint and plaintiffs' briefs describe Ms. Ortiz as having her benefits *reduced* from $75 monthly to $24 monthly. Although it appears that Ms. Ortiz is more properly classified as a recipient, the Court need not decide this question, in light of the decision below that applicants are properly within the class even without a named plaintiff who is an applicant.

relevant. In *Almenares*, AFDC recipients could represent AABD recipients in challenging hearing procedures because the hearing procedures under AFDC and AABD were identical. This case is analogous because, as defendants' counsel conceded at oral argument, the hearing procedures followed by DES are identical for applicants and recipients. Thus, while no applicant is a named plaintiff, one is not needed—the hearing procedures that allegedly harm recipients are the same procedures that allegedly harm applicants. The claims of recipients, in this case, are coextensive with the claims of applicants, and no relevant difference exists between the two groups that would justify excluding applicants from the class. It follows that the named plaintiffs are typical of the class that includes both recipients and applicants.

The Supreme Court's decision in *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), is consistent with this result. The issue presented in that case was "whether respondent Falcon, who complained that petitioner did not promote him because he is a Mexican-American, was properly permitted to maintain a class action on behalf of Mexican-American applicants for employment whom petitioner did not hire." 457 U.S. at 149, 102 S.Ct. at 2366. The Court found that the claims of an employee denied promotion were not shown to be typical of applicants that the employer refused to hire, primarily because plaintiff failed to offer evidence that defendant's alleged discrimination in promotion practices was reflected in its hiring practices. The Court noted that a class of employees and applicants, presumably represented by the same named plaintiff, could be certified if defendant treated them identically:

> If petitioner used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a). Significant proof that an employer operated under a gen-

eral policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes.

457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15. The hypothetical situation described by the Supreme Court is virtually identical to this case—the DES hearing procedures are conceptually equivalent to the biased testing procedure in the quoted passage. The Court's reasoning further supports the conclusion that the named plaintiffs satisfy the typicality requirement.

The case of *Buckhanon v. Percy*, 533 F.Supp. 822 (E.D.Wis.1982), *modified*, 708 F.2d 1209 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1281, 79 L.Ed.2d 684 (1984), does not indicate a different result. Plaintiffs there challenged the adequacy of notices of adverse action sent by the State agency and sought certification of a class of all public assistance applicants and recipients. After revising the class description to include only persons receiving notice of an aid reduction brought about by the Omnibus Budget Reconciliation Act of 1982 ("OBRA"), Pub.L. No. 97–35, 95 Stat. 357, the court eliminated applicants from the certified class because they never received the allegedly inadequate notices explaining the changes caused by OBRA. 533 F.Supp. at 829–30. In the case at bar, however, both applicants and recipients are subject to the same hearing procedures.

Defendants' remaining contentions on this issue can be disposed of in short order. First, defendants allege that if applicants were never found eligible to receive benefits, they would never "have questions concerning their eligibility for these benefits determined at administrative hearings." This contention is plainly incorrect. If an application for benefits is denied and the applicant requests a hearing, the issue at the hearing will be whether the decision to deny the application was correct or, more specifically, whether the applicant was eligible for benefits. Moreover, inclusion of

applicants does not indicate that plaintiffs challenge the process of application, as defendants stated in their brief, but only that plaintiffs challenge the hearing procedures afforded to applicants. Second, defendants point out that plaintiffs have failed to demonstrate that applicants satisfy the requirements of Rule 23(a). Obviously, such an independent showing for applicants is unnecessary, absent a finding by the Court that applicants are a subclass which must independently qualify under Rule 23(a). The showing that the class of applicants and recipients, taken together, meets the Rule 23(a) standards is enough.

### D. Adequacy of Representation

■ Rule 23(a)(4) requires the Court to consider whether "the representative parties will fairly and adequately protect the interests of the class." The Third Circuit Court of Appeals has established a two-part test for determining adequacy of representation: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to the class." *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 247 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Defendants do not contest, and the Court finds, that plaintiffs' counsel, a staff attorney with the Community Legal Aid Society, Inc., is qualified, experienced, and able to conduct this litigation. Defendants contend that plaintiffs have not met their burden of demonstrating that the named plaintiffs do not have interests antagonistic to the class, but defendants do not indicate what antagonistic interests the named plaintiffs possess. The complaint and the alleged facts of named plaintiffs' cases show that their interests are consistent with, and not antagonistic to, the interests of the class. Nothing more is required. The Court finds that the named plaintiffs are adequate class representatives and that plaintiffs have satisfied the requirements of Rule 23(a).

### E. Rule 23(b)(2) Requirements

■ Plaintiffs contend this action is appropriately certified as a Rule 23(b)(2) class action. Although defendants do not contest that plaintiffs have satisfied Rule 23(b)(2), the Court has an independent duty in class actions to determine that Rule 23's standards are met. If the complaint requests declaratory and injunctive relief, as plaintiffs have done here, the remaining requirement of the rule is that defendants must have acted on grounds generally applicable to the class. Plaintiffs have alleged, and defendants do not dispute, that the challenged practices employed by defendants in conducting hearings are class-wide and not limited to isolated instances. The examples placed in the record in the Appendix, especially the facts recited in Affidavit at A–191, demonstrate that the challenged practices have been used repeatedly. It is irrelevant that not all class members have been affected by all of the challenged practices. As the Advisory Committee stated in 1966, "Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Rule 23(b)(2), advisory committee note. Indeed, other courts considering class action challenges to public assistance practices have found the actions to be appropriate for treatment under Rule 23(b)(2). *See, e.g., Almenares v. Wyman*, 453 F.2d 1075 (2d Cir.1971), *cert. denied*, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972); *Buckhanon v. Percy*, 533 F.Supp. at 829–30; *Ellender v. Schweiker*, 550 F.Supp. 1348, 1360 (S.D.N.Y.1982); *Ingram v. O'Bannon*, 88 F.R.D. 653, 656 (E.D.Pa.1980); *Dixon v. Quern*, 76 F.R.D. 617, 620 (N.D.Ill.1977); *see also* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.40[1], at 23–285 to 286 & n. 5 (2d ed. 1984) (citing cases); *cf. Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979) ("class relief for [a challenge to Social Security recoupment practices] is peculiarly appropriate"). Based on this clear authority, the Court

finds that this action satisfies the requirements of Rule 23(b)(2). Accordingly, this class action satisfies Rule 23, and plaintiffs' Motion for Class Certification will be granted.

### III. Plaintiffs' Motion For Summary Judgment

■■■■ Plaintiffs have moved for summary judgment on all their remaining claims.[7] The party moving for summary judgment bears the burden of proving that there is no genuine issue as to any material fact. Any doubts as to the existence of a genuine factual issue are to be resolved against the moving party, and all inferences drawn from the record must be viewed in the light most favorable to the party opposing the motion. *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir.1981). In order to satisfy its burden, the moving party must bring forward evidence in support of its motion which demonstrates that there is no triable issue of fact. 6 Pt. 2 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.15[3], at 56–480 (2d ed. 1984); *id.* ¶ 56.22[2], at 56–1338. "Once the moving party has supplied sufficient affidavits in support of its motion, the opposing party must respond by supplementing the record in some manner—whether by its affidavits or otherwise—setting forth specific facts demonstrating that there is a genuinely disputed factual issue for trial." *Fireman's Insurance Co. v. DuFresne*, 676 F.2d 965, 965 (3d Cir.1982). Contrary to defendants' assertion in their brief, the party resisting the motion "may not rest upon the mere allegations or denials of his pleading," Fed.R.Civ.P. 56(e), and cannot depend on those pleadings to create a material issue of fact for trial. *Id.,* advisory committee note; *see Fireman's Insurance Co. v. DuFresne*, 676 F.2d at 965.

In support of their motion, plaintiffs have submitted a lengthy appendix, including deposition excerpts, documents from defendants' records, and an affidavit. Defendants have agreed that this appendix shall be treated as a joint appendix and have not placed in the record any opposing evidence or contrary affidavits. Consequently, the case is ripe for summary judgment, although summary judgment will not be granted for plaintiffs if the evidence they have adduced is susceptible to interpretations favoring defendants. 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2739 (2d ed. 1983).

■■■■ Plaintiffs have challenged defendants' hearing practices as being inconsistent with federal laws and regulations, the United States Constitution, and the Delaware Constitution. The first question the Court must decide is which claim should be considered first. Initially, the claim under the Delaware Constitution can be dismissed, as a federal district court cannot order state officials to obey state law. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).[8] With regard to the federal law and federal constitutional claims, it is well-established that a federal court must decide claims under federal statutes before deciding constitutional claims, in order to avoid unnecessary constitutional adjudication. *Califano v. Yamasaki*, 442 U.S. 682, 692, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979); *Hagans v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974). Accordingly, each of defendants' contested practices will

---

**7.** In addition to the procedural violations involved in the summary judgment motion, the complaint alleged that defendants fail to provide judicial review of agency decisions and improperly reverse recommended decisions, and that the Director, who makes final decisions, is not impartial. The first claim is now moot because judicial review is available, *see* pages 1050–1051 *supra;* the last two were not argued in the summary judgment briefs and are deemed abandoned for summary judgment purposes.

**8.** The dismissal of the claims based on the Delaware Constitution has little, if any, practical effect since, as plaintiffs readily admit, "[p]laintiffs' rights under the 14th Amendment are essentially the same as those guaranteed by article I, section 7 of the Delaware Constitution." Plaintiffs' Opening Brief In Support Of Their Motion For Class Certification And Summary Judgment, D.I. 47, at 41 n. *.

be examined in light of the applicable federal statutes and regulations and, if found lawful, will be examined under constitutional principles.

### A. Whether Defendants' Hearing Practices Are Consistent With Federal Law

#### 1. Ex Parte Communications

 Plaintiffs have placed in the record several cases in which the Hearing Representative or the Director received *ex parte* communications relating to a claim before rendering a decision. For example, in Ms. Ortiz's case, the Director, after receiving the recommended decision, asked her case supervisor about the case and examined Ms. Ortiz's case file, including documents not contained in the hearing record. The Director's decision, which rejected a recommended decision favorable to Ms. Ortiz, was based in part on documents contained in the case file which were not in the hearing record.[9] In Mr. Benson's case, the Director received a two-page, single-spaced memorandum after the hearing from three employees objecting to the Hearing Representative's recommended decision in favor of Mr. Benson. In neither case was the claimant made aware of these *ex parte* contacts or given an opportunity to respond to the facts or arguments presented in them.

The legal standard established in the regulations concerning *ex parte* contacts is clear. "[D]ecisions ... shall be based exclusively on evidence and other material introduced at the hearing." 45 C.F.R. § 205.10(a)(14) (1984); *accord,* 42 C.F.R. § 431.244(a) (1984); 7 C.F.R. §§ 273.-15(q)(1), 273.16(e)(2)(ii) (1985). Moreover, the regulations provide that claimants have the right to examine all documents used by the agency and refute any evidence, and to confront and cross-examine adverse witnesses. *See* 45 C.F.R. § 205.10(a)(13)(i); 42 C.F.R. § 431.242(a), (e); 7 C.F.R. §§ 273.-15(p)(1), (5), 273.16(e)(2)(ii). The two reported cases interpreting these provisions have

followed their clear meaning and have found that a procedural violation occurs when the decisionmaker bases his or her decision on evidence or analysis not presented at the hearing. *See Featherston v. Stanton,* 626 F.2d 591, 595 (7th Cir. 1980); *Persico v. Maher,* 191 Conn. 384, 465 A.2d 308, 322 (1983); *cf. Lonzollo v. Weinberger,* 534 F.2d 712, 714 (7th Cir. 1976) (Social Security disability case); *Gullo v. Califano,* 609 F.2d 649, 650 (2d Cir. 1979) (per curiam) (same); *Generella v. Weinberger,* 388 F.Supp. 1086, 1090 (E.D. Pa.1974) (same). Defendants do not contest that *ex parte* communications have taken place or that decisions cannot be based on such communications. Instead, defendants argue that the mere occurrence of *ex parte* contacts is not forbidden as long as the decision maker does not rely on evidence outside the record. This position is unacceptable. First, plaintiffs have demonstrated, at least in Ms. Ortiz's case, that the Director has based his decision on evidence outside the record. In the cases of Charles Benson and Denise Trader, the only credible inference is that the final decisions were based in part on *ex parte* communications. Second, defendants cite no authority for their distinction between considering *ex parte* communications and relying on them. The cases cited above, which the parties read differently, do not address this distinction. In practical terms, however, it would be difficult for plaintiffs to prove in most cases that an *ex parte* communication was a basis for a decision, because the defendants' decision letters do not specify what evidence they rely on, and because it is difficult to ascertain exactly what evidence influenced the decision maker. The Hearing Representative testified at his deposition that he would "like to think" that his decisions were based solely on the record evidence, but that he could not block out *ex parte* conversations from his mind. Moreover, the Director's mere consideration of *ex parte* argument, as occurred in the Benson case, would violate the claimant's right to refute any testimo-

---

**9.** Former Director Hayward stated at his deposition that he had looked at previous applications submitted by Ms. Ortiz, which were not part of the record, "as further proof to back up the one that was included in the Fair Hearing file." A–16.

ny or evidence. *See Persico v. Maher*, 465 A.2d at 322; *cf. Camero v. United States*, 375 F.2d 777, 779, 179 Ct.Cl. 520 (1967) ("one of the fundamental premises inherent in the concept of an adversary hearing ... is that neither adversary be permitted to engage in an *ex parte* communication concerning the merits of the case with those responsible for the decision"); *Morgan v. United States*, 304 U.S. 1, 17–19, 58 S.Ct. 773, 776–77, 82 L.Ed. 1129 (1938).

For all these reasons, the Court finds unpersuasive the distinction urged by defendants between consideration of and reliance on *ex parte* communications. Both are impermissible. I find that defendants' practice of considering *ex parte* communications concerning the merits of a case violates the claimant's rights, under federal regulations, to a decision based solely on the evidence adduced at the hearing, and to be confronted with, cross-examine, and refute all adverse evidence.

### 2. Adequacy of Notice

Plaintiffs contend the notices of adverse action typically sent to claimants are inadequate because they fail to explain fully the reasons for the agency's action, cite the regulations supporting the action, or present the calculations involved in the agency's action. In support of their claim, plaintiffs have placed in the record several notices of adverse action sent to class members. The notices typically contain a one sentence explanation for the agency's action, such as, "children's wages exceed eligibility limit," A–156, or "you are over the gross income eligibility limit," A–158, or "you did not provide a protective payee as requested." A–159. None of the notices in the record contain citations of regulations, the specific calculations used by the agency, or detailed explanations.

■ The regulatory definition of an adequate notice contains specific requirements:

"Adequate" means a written notice that includes a statement of what action the agency intends to take, the reasons for the intended agency action, the specific regulations supporting such action, explanation of the individual's right to request an evidentiary hearing (if provided) and a State agency hearing, and the circumstances under which assistance is continued if a hearing is requested.

45 C.F.R. § 205.10(a)(4)(i)(B) (1984) (AFDC); *accord,* 45 C.F.R. § 431.210 (1984) (Medicaid); *see also* 7 C.F.R. §§ 273.13(a), 273.-16(e)(3) (1983) (Food Stamps).[10] Defendants have not been complying with one aspect of these regulations—the requirement that the notice includes "the specific regulations supporting such action." Defendants will be required to include regulatory citations in future notices.

■ The more substantial question is whether the defendants' notices adequately explain "the reasons for the intended action." Since this phrase is not self-defining, the Court will look, as other courts have, to the requirements of due process. *See, e.g., Schroeder v. Hegstrom*, 590 F.Supp. 121, 127 (D.Ore.1984). Due process requires "that a recipient have timely and adequate notice detailing the reasons for a proposed termination." *Goldberg v. Kelly*, 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). At a minimum, due process requires the agency to explain, in terms comprehensible to the claimant, exactly what the agency proposes to do and why the agency is taking this action. If DES finds that a claimant has not performed some action that the regulations require, the notice must explain what

10. The term "adequate" is used but not defined in the current edition of the Food Stamps regulations. *See* 7 C.F.R. § 273.13(a) (1985). This omission, however, appears to be the result of an editing error in the Code of Federal Regulations. In the 1983 version of C.F.R., adequacy of notice was defined in the third sentence of 7 C.F.R. § 273.13(a)(2). Subsequently, the Department of Agriculture, in the February 11, 1983 Federal Register, amended 7 C.F.R. § 273.-13(a)(2) "by removing the first and second sentences." 48 Fed.Reg. 6316. The editors of C.F.R., however, removed the first, second, and third sentences of § 273.13(a)(2), thereby removing the definition of adequate notice without authority. It follows that the definition of adequate notice contained in the 1983 regulations remains in force, despite its omission from later editions of C.F.R.

the claimant was required to do and how his or her actions failed to meet this standard. *See Banks v. Trainor,* 525 F.2d 837, 842 (7th Cir.1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *Hill v. O'Bannon,* 554 F.Supp. 190, 197 (E.D.Pa.1982); *In re Clark,* 122 N.H. 888, 451 A.2d 1303, 1304–05 (1982). If calculations of a claimant's income or resources are involved, DES must set forth the calculations it used to arrive at its decision, *i.e.,* explain what funds it considers the claimant to have and what the relevant eligibility limits are. *See Dilda v. Quern,* 612 F.2d 1055, 1056–57 (7th Cir.) (per curiam), *cert. denied,* 447 U.S. 935, 100 S.Ct. 3039, 65 L.Ed.2d 1130 (1980); *Banks v. Trainor,* 525 F.2d at 842; *Philadelphia Welfare Rights Organization v. O'Bannon,* 525 F.Supp. 1055, 1060 (E.D.Pa.1981); *Schroeder v. Hegstrom,* 590 F.Supp. 121, 128–30 (D.Ore.1984); *Jones v. Blinziner,* 536 F.Supp. 1181, 1197–99 (N.D.Ind.1982); *Buckhanon v. Percy,* 533 F.Supp. at 833; *Willis v. Lascaris,* 499 F.Supp. 749, 760 (N.D.N.Y.1980); *but see Garrett v. Puett,* 707 F.2d 930, 931 (6th Cir.1983) (per curiam). This detailed information is needed to enable claimants to understand what the agency has decided, so that they may assess the correctness of the agency's decision, make an informed decision as to whether to appeal, and be prepared for the issues to be addressed at the hearing. *See Dilda v. Quern,* 612 F.2d at 1056–57; *Banks v. Trainor,* 525 F.2d at 842; *Jamroz v. Blum,* 509 F.Supp. 953, 961–62 (N.D. N.Y.1981).[11]

■ Defendants allege that any deficiencies in the notices were "technical only" and argue that plaintiffs have failed to show how they were actually disadvantaged by the inadequate notices. Moreover, defendants contend, any questions plaintiffs had about agency action could be resolved by phone calls to their caseworkers or to the Hearing Representative. Defendants cite no authority for the first part of this argument—that plaintiffs must show that they were actually harmed by inadequate notice—and the Court finds it to be without merit. Plaintiffs are seeking to compel defendants to obey the law, not to recover compensation for harm done to them.

■ Defendants' second contention— that notice inadequacies are unimportant because claimants can call the agency for more detailed information—has been repeatedly rejected by other federal courts. *See Vargas v. Trainor,* 508 F.2d 485, 489–90 (7th Cir.1974); *Banks v. Trainor,* 525 F.2d at 840; *Schroeder v. Hegstrom,* 590 F.Supp. at 128; *Hill v. O'Bannon,* 554 F.Supp. at 197. The plain language of the regulatory definition of "adequate," quoted above, requires written notice. Moreover, the burden of providing adequate notice rests with the state, and it cannot shift that burden to the individual by providing inadequate notice and inviting the claimant to call to receive complete notice. *See Schroeder v. Hegstrom, supra; Hill v. O'Bannon, supra.* As the Seventh Circuit Court of Appeals observed in *Vargas v. Trainor, supra,* public assistance recipients are often less capable than other people of taking affirmative actions to protect their interests. 508 F.2d at 489. The result of requiring claimants to make phone calls to obtain adequate notice would be that only the aggressive would receive due process, whereas the applicable regulations require the state to provide due process for all claimants. In short, defendants' argument is unconvincing and inconsistent with due process.[12]

■ Plaintiffs also allege defendants have held hearings in which the issues addressed were different than the issues raised in the notices sent to claimants, and

11. The Supreme Court's recent decision in *Atkins v. Parker,* —— U.S. ——, 105 S.Ct. 2520, 86 L.Ed.2d 81 (U.S.1985), analyzing the notices provided to Food Stamps recipients, is inapposite. *Atkins* involves notification of a change in the law and "does not concern procedural fairness of individual eligibility determinations." —— U.S. at ——, 105 S.Ct. at 2529.

12. Defendants also argue that the adequacy of the notices is a disputed issue of material fact. However, because the contents of the notices are not disputed, no factual issue exists. The adequacy of the notices is a legal issue, requiring the Court to compare the contents of the notices with the applicable regulations.

the final decisions were based in part on these new issues. Defendants do not dispute the basic principle that claimants must receive notice of the issues to be discussed at the hearing. Instead, defendants argue that plaintiffs have not shown, in each illustrative case discussed by plaintiffs, that DES did not have adequate grounds for its decisions based on the issues of which claimants were given notice. This contention, a type of "harmless error" argument, is without merit in this context. Plaintiffs are not seeking to relitigate each illustrative case, and it is irrelevant that adequate grounds may have existed in individual cases to reach the same decision. The point is that defendants regularly follow a practice that is inconsistent with plaintiffs' due process rights. Fundamental due process requires that a person be informed in advance of the issues to be addressed at a hearing, so that he or she can be prepared to present evidence and arguments that address those issues.

■ In sum, defendants' practice of basing decisions on issues raised for the first time at the hearing violates the claimant's procedural rights, specifically the right to receive notice and to refute arguments presented by the agency. Although this practice is unlawful, injunctive relief on this point is not warranted at this time. A review of the record indicates this problem is a side effect of the defendants' practice of providing inadequate notice. In the cases cited by plaintiffs, the initial notice gave a partial explanation of the reason for the proposed action, but the final decision relied on another aspect of the same issue that was not explained in the initial notice. Due process problems would not have existed if the initial notices had fully explained the agency's decision. This problem of switching issues should be resolved when defendants provide adequate notice.

### 3. Use of Hearsay Evidence

Plaintiffs object to the defendants' practice of accepting hearsay evidence at hear-

ings, alleging that this practice conflicts with their right, under the applicable regulations, to "question or refute any testimony or evidence, including [the] opportunity to confront and cross-examine adverse witnesses." 45 C.F.R. § 205.10(a)(13)(vi) (1984); *accord,* 42 C.F.R. § 431.242(e) (1984); 7 C.F.R. §§ 273.15(p)(5), 273.-16(e)(2)(ii) (1985). Plaintiffs do not contest, however, that the ordinary hearsay exceptions of Delaware Uniform Rule of Evidence 803 are applicable to DES hearings; instead, they argue defendants unlawfully consider hearsay evidence that is not admissible under the usual exceptions. The DES Economic Service Policy Manual provides that hearsay evidence is inadmissible in DES hearings, with four exceptions:

1. Medical records including statements to physicians relative to treatment;

2. Business records;

3. Official records of the Department of Health and Social Services and other official records when admitted into evidence by the custodian of the records;

4. Evidence recognized by official notice as an exception to the hearsay rule.

DES Manual, D.I. 57, § 5500. The last exception, although far from clear, is apparently interpreted by defendants to mean that the usual exceptions to the hearsay rule are recognized. *See* Defendants' Answering Brief In Opposition To Defendants' [sic] Motions For Class Certification And Summary Judgment, D.I. 51, at 33.

■ The examples cited by plaintiffs in their briefs demonstrate that defendants may have, in some instances, accepted hearsay evidence that did not fit into one of the hearsay exceptions, in violation of defendants' own regulations. However, the fact that hearing officers may have made some erroneous decisions to admit hearsay evidence does not justify a grant of injunctive relief. The agency has a rule prohibiting hearsay that is not significantly different than Delaware Rule 803,[13] and plain-

---

**13.** Plaintiffs allege that the first three exceptions in section 5500 are broader than their counterparts in Rule 803. Whether or not this is true,

the differences between Rule 803 and those three exceptions are not substantial enough to

tiffs concede that rule can be applied to DES hearings. Further, it appears from the cases discussed by plaintiffs that DES officials do make a good faith effort to apply the hearsay rule. Finally, plaintiffs have failed to cite any authority, other than the general language of the regulations, in support of their argument that the admission of hearsay evidence violates claimants' rights of confrontation. It is not self-evident that admission of hearsay violates due process, especially since hearsay is routinely admitted in civil and criminal trials. In sum, although defendants may make some mistakes in applying the hearsay rule—as do district courts—those mistakes do not warrant injunctive relief.

### 4. Inadequate Final Decision Letters

■ Plaintiffs also contend that the contents of the final decisions sent to claimants are inadequate under the pertinent federal regulations. The regulations for all three programs provide that claimants must receive decisions that "summarize the facts of the case, specify the reasons for the decision, and identify the supporting evidence and the pertinent federal regulations." 7 C.F.R. § 273.15(q)(2) (1985); *accord,* 7 C.F.R. § 273.16(e)(7) (1985); 42 C.F.R. § 431.244(d), (e) (1984); 45 C.F.R. § 205.10(a)(15) (1984).[14] In food stamp disqualification cases, the decision must also respond to reasoned arguments made by the recipient. 7 C.F.R. § 273.16(e)(7).

The uncontroverted evidence in the record demonstrates that defendants do not comply with any of these requirements. First, the uncontroverted affidavit of Anne M. Perillo, plaintiffs' counsel, analyzing all the decision letters produced during discovery states that none of the decision let-

ters summarizes the facts. The decision letters in the record confirm this conclusion. Second, Ms. Perillo's affidavit states that the vast majority of the decision letters contain either no reason or only conclusory reasons. Although the Court is not required to accept the affidavit's characterization of the reasons as conclusory, a review of the decisions letters in the record, which Ms. Perillo avers are typical of all decision letters produced, demonstrates the decision letters do provide only conclusory reasons. A representative example is the decision letter of Lillie Hoskins, which gives this one-sentence explanation for the decision: "Based on the evidence presented at your Fair Hearing, I find that you received AFDC benefits in excess of the amount to which you were entitled." A–194. Defendants must do more than this to specify the reasons for the decision. Ms. Perillo's affidavit also states that virtually all decision letters fail to identify the supporting evidence relied upon by the decisionmaker. Again, a reading of the record shows that this conclusion is correct. Finally, Ms. Perillo's affidavit states, and the record shows, that the decision letters do not identify the pertinent federal regulations.

In sum, the defendants' decision letters do not comply with any of the requirements of the applicable federal regulations. These failures are not surprising, as the former Director of DES testified at his deposition that he had never read the regulations and did not know what decision letters were supposed to contain. A–10–10a. Such ignorance of the law by an official responsible for following it cannot be countenanced. Accordingly, defendants will be ordered to comply with the applica-

---

cause a deprivation of plaintiffs' rights to confront and cross-examine witnesses.

**14.** The AFDC and Medicaid regulations provide for a two-step hearing procedure, under which a claimant receives an initial decision after an evidentiary hearing, and a second decision after *de novo* review of the initial decision by the state agency. *See* 42 C.F.R. § 431.244(d), (e); 45 C.F.R. § 205.10(a)(15). DES follows a similar procedure, except that the uncontradicted evidence in the record shows that claimants

never receive a copy of the hearing representative's recommended decision, which is comparable to the initial decision contemplated by the regulations. Accordingly, to effectuate the rights granted to claimants by the regulations, the final decision letters must satisfy the combined requirements of both levels. If DES begins sending claimants the recommended decisions, as counsel for defendants suggested at oral argument, then each decision under AFDC and Medicaid would only have to comply with the appropriate regulatory requirements.

ble federal regulations in writing decision letters.

### 5. Impartiality of the Decision Maker

██ Finally, plaintiffs contend that the State Hearing Representative, who prepares recommended decisions and draft decision letters, is responsible both for advocating the State's position in hearings and for assisting the Director in deciding the cases. This dual role, plaintiffs argue, violates claimants' right, under federal regulations and constitutional due process, to an impartial decision maker. *See* 7 C.F.R. §§ 273.15(m), 273.16(e)(2)(ii); 42 C.F.R. § 431.240(a)(3); 45 C.F.R. § 205.10(a)(9). Summary judgment cannot be granted on this issue, however, because the role of the Hearing Representative is a material factual issue in dispute. While the DES Director testified that the Hearing Representative is responsible for presenting DES's side of the case, A-2, the Hearing Representative denied that he acts as an advocate for DES. A-72-73. Although there is additional evidence that the Hearing Representative acts on behalf of the State—for example, his ability to "concede" cases before the hearing—this evidence does not negate the existence of a factual dispute which cannot be resolved at the summary judgment stage.

██ A related problem with the role of the Hearing Representative is amenable to summary judgment. In Delaware, the DES hearing officer conducts hearings and administers oaths, but does not prepare the recommended decision. *See* A-60. Federal Food Stamps regulations, however, provide that the hearing officer who conducts the hearings shall prepare the recommended decision. 7 C.F.R. §§ 273.-15(m)(2)(vi), 273.16(a)(2)(ii) (1985). The AFDC and Medicaid regulations also provide for the recommended decision to be prepared by a "hearing official" or "hearing officer," but the regulations do not clearly indicate that the same individual

who conducts the hearing must prepare the recommended decision. *See* 42 C.F.R. §§ 431.240(a), 431.244(b)(3) (1984); 45 C.F.R. §§ 205.10(a)(9), (14) (1984). It follows that the Court can only find that defendants' practice of having the Hearing Representative prepare recommended decisions in Food Stamps cases violates federal regulations.

Defendants' own regulations do state that the recommended decision must be prepared by the hearing officer. *See* DES Policy Manual, §§ 5305-06. However, under the holding of *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), a federal court is without power to order state officials to obey state laws or regulations. Thus, while defendants' practice of having the Hearing Representative prepare the recommended decision violates their own regulations, this Court is powerless to order those officials to obey those regulations.[15] If plaintiffs desire such an order, they must obtain it from the Delaware state court.

### B. Availability of Judicial Review

██ Since plaintiffs initiated this lawsuit, the Delaware legislature passed a law providing claimants with a right to appeal adverse hearing decisions within thirty days to the Delaware Superior Court. 64 *Del.Laws*, c. 482, § 1, codified at 31 *Del.C.* § 520 (effective September 29, 1984). At oral argument, defendants' counsel argued for the first time that the availability of judicial review precludes plaintiffs' action because, under the doctrine of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), plaintiffs have an adequate remedy in state court. Although this argument was made too late to require the Court's consideration, it is patently without merit and therefore can be easily dismissed. The *Parratt* doctrine has no applicability to actions such as this one

---

**15.** If these regulations were part of the State's "plan" of complying with federal law and regulations, a violation of those regulations would be an enjoinable violation of federal law. *See Barnes v. Cohen*, 749 F.2d 1009, 1019 (3d Cir.

1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). There is no evidence in the record, however, indicating that the current DES regulations were part of the State's plan.

brought to challenge established state procedures or practices. *Davidson v. O'Lone,* 752 F.2d 817, 828 (3d Cir.1984) (in banc), *cert. granted,* — U.S. —, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985).

## IV. Conclusion

To summarize, it has been held that this action shall be certified as a class action and that several of defendants' practices violate plaintiffs' rights under federal regulations and the Due Process Clause and must be enjoined. Specifically, those unlawful practices are: the decision maker's consideration of *ex parte* communications and evidence outside the record; inadequate notices of agency action sent to claimants; inadequate final decision letters issued by the Director; and, in Food Stamps cases, the preparation of recommended decisions by the Hearing Representative rather than the Hearing Officer. Summary judgment will be granted on those issues and denied on all others.

To remedy these procedural violations, defendants will be ordered to rectify these unlawful practices, to bring their management of administrative procedures in compliance with federal law. In addition, defendants will be required to grant new hearings within sixty days to all class members who were adversely affected by defendants' unlawful practices.

Plaintiffs shall confer with defendants and submit a proposed form of order, on notice, within ten days.