ATTORNEYS FOR APPELLANTS
Gavin M. Rose
ACLU of Indiana
Indianapolis, Indiana

Jacquelyn Bowie Suess
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
Gregory F. Zoeller
Attorney General of Indiana

David L. Steiner
Deputy Attorney General
Indianapolis, Indiana



# In the
# Indiana Supreme Court

No. 49S02-1107-PL-437

SHEILA PERDUE, ET AL.,                                    *Appellants (Plaintiffs below),*

v.

MICHAEL A. GARGANO,[1] ET AL.,                           *Appellees (Defendants below).*

Appeal from the Marion Superior Court, No. 49D10-0803-PL-13340
The Honorable David J. Dreyer, Judge

On Transfer from the Indiana Court of Appeals, No. 49A02-1003-PL-250

**March 22, 2012**

**Dickson, Justice.**

In this challenge to the Indiana Family and Social Services Administration's (FSSA) automated system of processing claims for Medicaid, Food Stamps, and Temporary Assistance to Needy Families (TANF) benefits, we reverse the judgment of the trial court and hold that the FSSA's denial notices are insufficiently explanatory but that the FSSA may deny an application

---

[1] In the trial court and the Court of Appeals, the named defendant-appellee was Anne W. Murphy in her official capacity as the Secretary of the Family and Social Services Administration. Ms. Murphy was succeeded by Michael A. Gargano as Secretary in the intervening time. As such, Mr. Gargano has been automatically substituted for Ms. Murphy as the defendant-appellee pursuant to Indiana Appellate Rule 17(C)(1).

for Food Stamp benefits when the applicant fails to cooperate in the eligibility determination process. We affirm in part the trial court's grant of Perdue's motion for summary judgment and hold that Sheila Perdue is entitled to reasonable accommodations in applying for benefits but that this does not necessarily require providing a caseworker or case management services.

The plaintiffs brought this class action complaint seeking declaratory and injunctive relief alleging violations of their federal statutory and constitutional rights. The plaintiffs consist of three plaintiff-classes (Class A, Sub-class A, and Class C) and Sheila Perdue individually. The plaintiffs in Class A and Sub-class A allege that the notices used by the FSSA to inform applicants[2] for Medicaid, Food Stamp, and TANF benefits of an adverse determination of eligibility violate their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and federal Medicaid regulations.[3] These plaintiffs contend that the adverse action notices do not provide a sufficient explanation of the reasons for the FSSA's eligibility determination. The plaintiffs in Class C allege that the FSSA violates federal Food Stamp law when it denies plaintiffs' applications for benefits based upon a determination that the applicant has "failed to cooperate" in the application process.[4] These plaintiffs contend that federal law only permits an applicant to be denied benefits for affirmatively "refusing to cooperate." Alternatively, the plaintiffs in Class C claim that, even if the FSSA's grounds for determining that the plaintiffs have "failed to cooperate" in the application process are sufficient to support a determination that the plaintiffs have "refused to cooperate," the FSSA has violated the due process rights of the plaintiffs by providing the incorrect reason for the agency's adverse eligibility determination. Lastly, Sheila Perdue claims that, in discontinuing her Food Stamp and Medicaid benefits, the FSSA violated her rights under the Americans with Disabilities Act of 1990

---

[2] For simplicity, "applicant(s)" is used to refer to both first-time applicants seeking initial certification of eligibility and current benefits recipients seeking recertification of eligibility. Adverse determinations are generally termed "denials" for new applicants and are termed "discontinuations" for current beneficiaries. The processes for certification and recertification are described in detail elsewhere in the opinion.

[3] Specifically, the plaintiffs claim that the FSSA has violated Title 42, Section 431.205(d) of the Code of Federal Regulations, which pertains to Medicaid. Appellants' Br. at 25 n.11. Section 431.205(d), however, mandates only that the Medicaid hearing procedures comply with "the due process standards set forth by Goldberg v. Kelly, 397 U.S. 254 (1970)." 42 C.F.R. § 431.205(d). As such, the plaintiffs' statutory claim under Section 431.205(d) is duplicative of their constitutional due process claim.

[4] The plaintiffs argue that an adverse eligibility determination based on an applicant's "failure to cooperate" contravenes the requirements of Title 7, Section 2015(c) of the United States Code and Title 7, Section 273.2(d)(1) of the Code of Federal Regulations.

("ADA"), 42 U.S.C. §§ 12101–12300, and Section 794 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794, by failing to accommodate her disability as required by the Acts.[5]

In the trial court, the plaintiffs moved for summary judgment as to all three claims. The State filed a response requesting that the trial court deny summary judgment to the plaintiffs and instead enter summary judgment in favor of the State as to all three counts in accordance with Indiana Trial Rule 56(B).[6] The trial court denied the plaintiffs' motion as to Class A and Sub-class A finding that due process was satisfied by the FSSA's "multi-step process for eligibility determination" and entered summary judgment for the State. Findings of Fact, Conclusions of Law, and Summary Judgment, Appellants' App'x at 29, 37. As to Class C, the trial court granted summary judgment to the plaintiffs, concluding that federal Food Stamp law only permits a denial of benefits where the applicant has "refused to cooperate." *See id.* at 30–31, 37. Accordingly, the trial court permanently enjoined the FSSA from "terminating, denying, or discontinuing the Food Stamp applications or benefits of the members of Class C based on an alleged 'failure to cooperate' with the agency." *Id.* at 37–38. Finally, as to Sheila Perdue, the trial court granted her motion for summary judgment, concluding that the FSSA had failed to accommodate her disabilities in violation of the ADA and the RA. *Id.* at 36–37. The court "permanently enjoined [the FSSA] from terminating, denying, or discontinuing the Medicaid, Food Stamp, and TANF applications or benefits of Sheila Perdue based on an alleged 'failure to cooperate' with the agency unless and until the agency provides [her] with a caseworker or case management services adequate to ensure that [her] individual disabilities are accommodated by the agency." *Id.* at 38. The plaintiffs filed an appeal as to Class A and Sub-class A, and the State cross-appealed as to Class C and Sheila Perdue. The Court of Appeals reversed the trial court as to Class A and Sub-Class A concluding that due process entitles applicants to notice of the "specific reason for [the FSSA']s denial decision" and affirmed the trial court as to the claims of Class C and Sheila Perdue finding that the trial court had merely ordered the FSSA "to follow the law." Perdue v. Murphy, 938 N.E.2d 766, 775–76, 778 (Ind. Ct. App. 2010). We granted transfer and now reverse

---

[5] 29 U.S.C. § 794 is commonly referred to as Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355.

[6] Indiana Trial Rule 56(B) provides, in relevant part: "When any party has moved for summary judgment, the court may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment is filed by such party."

the trial court as to Class A and Sub-Class A and as to Class C, and also affirm in part the trial court as to Sheila Perdue.

The parties do not dispute the underlying facts of this case, which are summarized herein. The FSSA is charged with, among other things, administering the Medicaid, Food Stamp, and TANF programs for the State of Indiana. Each of these programs provide welfare benefits to individuals and families in need of financial assistance in Indiana. To be deemed eligible for a particular program, an individual must be certified as eligible by the FSSA and recertified either annually or semi-annually depending on the particular program. The processes for initial certification and recertification are virtually identical, though recertification generally requires less information from the applicant.

The first step in the certification process is an interview between an FSSA caseworker and an applicant, which is scheduled by the FSSA's computer system. The interview is conducted either over the telephone or in-person, depending on the county where the applicant resides. During the interview, the caseworker and the applicant explore potential areas of eligibility for particular programs and discuss the types of information and verification documents necessary to establish eligibility. The applicant then receives State Form 2032 entitled "Pending Verifications for Applicants/Recipients" specifying the particular documentation that is required by the agency to establish eligibility.[7] Form 2032 lists several categories of information (e.g., "Age, Citizenship, Immigration Status"; "Relationship/Identity"; "Bank Accounts/Financial Holdings") for which the FSSA might request documentation. Each category provides examples of the types of documents that an applicant can submit as verification of the required information. Next to each listed category is a box that can be checked to indicate the specific categories of documentation required to establish a particular applicant's eligibility. In some cases the caseworker who conducts the interview will include additional hand-written notes in the margins indicating particular documents needed for a determination. Form 2032 expressly states that applicants are permitted to submit documents other than those specifically requested that provide the same information.

---

[7] It is unclear from the designated materials whether Form 2032 is given to the applicant at the interview, if it is conducted in-person, or sent via the mail subsequently.

4

It also directs applicants to call their interviewer if they have questions and provides the interviewer's name and contact information.

If the applicant fails to submit all of the necessary documentation within the designated time period, the application for benefits is denied or, in the case of recertification, the applicant's benefits are discontinued.[8]  Once such a determination has been made, the FSSA sends the applicant a notice of adverse action informing the applicant of the agency's decision.  The notice contains the name of the applicant, the program name for which benefits were sought, the date of the application, and the code(s) with the corresponding standardized explanation of the reason(s) for the adverse action ("reason codes") (e.g., "Failure to cooperate in verifying income"; "Failure to cooperate in verifying the value of resources").  The notice does not provide any additional explanation of the reasons for the denial.  At the top of the notice is a toll-free 1-800 telephone number and the mailing address for the FSSA.

We review an appeal of a trial court's ruling on a motion for summary judgment using the same standard applicable to the trial court.  Wilson v. Isaacs, 929 N.E.2d 200, 202 (Ind. 2010).  Therefore, summary judgment is appropriate only if the designated evidence reveals "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Ind. Trial Rule 56(C).  Appellate review of summary judgment is limited to evidence designated to the trial court.  Ind. Trial Rule 56(H).  All facts and reasonable inferences drawn from the evidence designated by the parties must be construed in the light most favorable to the non-moving party.  Mangold ex rel. Mangold v. Ind. Dept. of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001).  We do not defer to the trial court's determination of the law.  Wilson, 929 N.E.2d at 202–03 (citing Freidline v. Shelby Ins. Co., 774 N.E.2d 37, 39 (Ind. 2002)).

### 1.  Due Process and Adverse Action Notices

The plaintiffs in Class A and Sub-class A argue that the notices used by the FSSA to inform class member-applicants that they have been denied Medicaid, Food Stamp, or TANF pro-

---

[8] For simplicity, both denials and discontinuances of benefits are referred to collectively as "denials."

gram benefits violate their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Title 42, Section 431.205(d) of the Code of Federal Regulations pertaining to Medicaid. They argue that the reason codes fail to adequately explain the agency's reasons for denying benefits. Specifically, they challenge six reason codes:

- Failure to cooperate in establishing eligibility (Code 309)[9]
- Failure to cooperate in verifying income (Code 315)
- Failure to cooperate in verifying the value of resources (Code 484)
- Failure to verify Indiana residency (Code 574)
- Failure to cooperate in verifying assistance group composition (Code 587)
- Failure to submit medical information necessary to establish eligibility (Code 595)

Appellants' Br. at 12; Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Appellees' App'x at 364–65. The plaintiffs contend that due process requires "notice specifying which *specific* document or documents [an applicant] is alleged to have failed to provide" so that individuals can make informed decisions about whether to appeal an adverse determination. Appellants' Br. at 31. We agree that due process requires a more detailed explanation of the reasons underlying an adverse determination.

The Due Process Clause of the Fourteenth Amendment declares that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process requires a two-part inquiry: "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59, 119 S. Ct. 977, 989, 143 L. Ed. 2d 130, 149 (1999) (citing U.S. Const. amend. XIV, § 1 and Mathews v. Eldridge, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)) (citations omitted).

Both parties acknowledge that the entitlement benefits at issue in this case (Medicaid, Food Stamp, TANF) are properly characterized as "property" interests within the meaning of the

---

[9] The State notes that the FSSA has discontinued the use of this particular reason code. Nonetheless, we agree with the plaintiffs that this fact is not relevant to the disposition of this issue for two reasons: First, as the plaintiffs argue, the code has potentially served as the basis for termination in some of the class-members cases. Second, as the Court of Appeals concluded, 938 N.E.2d at 770 n.4, the FSSA's discontinuation of the code was entirely voluntary and the FSSA has made no formal commitment to refrain from using the code again in the future.

Due Process Clause.  Appellants' Br. at 24; Appellees' Br. at 16.  We agree.  There is no question that these entitlement benefits are "property" entitled to the full panoply of due process protections.  *See* Atkins v. Parker, 472 U.S. 115, 128, 105 S. Ct. 2520, 2528, 86 L. Ed. 2d 81, 92 (1985) (recognizing Food Stamp benefits as a protected property interest); Mathews, 424 U.S. at 332, 96 S. Ct. at 901, 47 L. Ed. 2d at 31–32 (recognizing Social Security disability benefits as a protected property interest); Goldberg v. Kelly, 397 U.S. 254, 261–62, 90 S. Ct. 1011, 1017, 25 L. Ed. 2d 287, 295–96 (1970) (recognizing federal welfare benefits as a protected property interest); *see also* Sullivan, 526 U.S. at 60, 119 S. Ct. at 990, 143 L. Ed. 2d at 150 (recognizing the property interests in Goldberg and Mathews).

Turning next to the question of what process is due, the fundamental requirement of procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner.  Goldberg, 397 U.S. at 267, 90 S. Ct. at 267, 25 L. Ed. 2d at 299.  When a deprivation is contemplated, "these principles require that a recipient have timely and *adequate notice detailing the reasons for a proposed termination*, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally."  *Id.* at 267–68, 90 S. Ct. at 267, 25 L. Ed. 2d at 299 (emphasis added).[10]

Detailed notice, however, is not required in all instances.  The Supreme Court held, in Atkins, that less detailed notice is required when a deprivation is unintentional because the state "could not give notice of a [deprivation] that was simply the consequence of an unintended mistake."  472 U.S. at 127 n.30, 105 S. Ct. at 2528 n.30, 86 L. Ed. 2d at 92 n.30.  In Atkins, Congress amended the Food Stamp Act to reduce the earned income deduction, which necessitated the reduction or termination of benefits to many existing Food Stamp recipients.  *Id.* at 118, 105 S. Ct. at 2523, 86 L. Ed. 2d at 86.  Accordingly, the Massachusetts Department of Public Welfare mailed notices to affected recipients informing them that their Food Stamp benefits were being reduced or terminated pursuant to the statutory change.  *Id.* at 120, 105 S. Ct. at 2524, 86 L. Ed.

---

[10] The State urges us to apply Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950), to assess the constitutional adequacy of the notices at issue here.  Mullane is limited, however, to evaluating the "adequacy of the *method* used to give notice," not the content of that notice.  Dusenbery v. United States, 534 U.S. 161, 168, 122 S. Ct. 694, 699, 151 L. Ed. 2d 597, 605 (2002) (emphasis added).

2d at 87. Some of the reductions and terminations in benefits, however, resulted not from the statutory amendment but from "inadvertent errors . . . made in calculating benefits."[11] *Id.* at 127, 105 S. Ct. at 2528, 86 L. Ed. 2d at 92. Obviously, because these deprivations were unanticipated and unintended, the notices contained no reference to the miscalculations. In response to the recipients' claim that the notices were inadequate, the Court concluded that the notices were sufficient as to the deprivations precipitated by the inadvertent miscalculation of benefit amounts because the notices "plainly informed each household of the opportunity to request a fair hearing and the right to have its benefit level frozen if a hearing was requested." *Id.* at 128, 105 S. Ct. at 2528, 86 L. Ed. 2d at 92. The Court did not offer any general principles for distinguishing "inadvertent errors" from other types of errors. However, based on the facts of Atkins, the "inadvertent error" exception appears to be a narrow one, appropriately limited to accidental deprivations.

Here, the plaintiffs challenge the denial of their benefits on grounds that they have failed to cooperate in the certification process or failed to submit certain required information. Neither the plaintiffs nor the State contend that the deprivations (i.e., the denials of benefits) were in any way inadvertent or accidental. Instead, the plaintiffs allege that at least some of these deprivations were *intentional* but based on erroneous information. As such, Atkins's "inadvertent error" exception does not apply to the notices at issue in this case because they were not accidental. We must, therefore, continue our analysis under the more strenuous notice requirement of Goldberg.

In a trio of cases, the Seventh Circuit defined the contours of Goldberg's adequate notice requirement. *See* Vargas v. Trainor, 508 F.2d 485 (7th Cir. 1974), *cert. denied*, 420 U.S. 1008, 95 S. Ct. 1454, 43 L. Ed. 2d 767 (1975); Banks v. Trainor, 525 F.2d 837 (7th Cir. 1975), *cert. denied*, 424 U.S. 978, 96 S. Ct. 1484, 47 L. Ed. 2d 748 (1976); Dilda v. Quern, 612 F.2d 1055 (7th Cir. 1980), *cert. denied*, 447 U.S. 935, 100 S. Ct. 3039, 65 L. Ed. 2d 1130 (1980).[12] In Var-

---

[11] Apparently, the simultaneous occurrence of the statutory change and the miscalculation was coincidental and not causally connected. Atkins, 472 U.S. at 127–28, 105 S. Ct. at 2528, 86 L. Ed. 2d at 92.

[12] The Seventh Circuit's approach has been followed by several other jurisdictions addressing the adequacy of notices in similar contexts. *See, e.g.*, Kapps v. Wing, 404 F.3d 105 (2d Cir. 2005); Ortiz v. Eichler, 794 F.2d 889 (3rd Cir. 1986), *aff'g* Ortiz v. Eichler, 616 F. Supp. 1046 (D. Del. 1985); Schroeder

gas, the Seventh Circuit examined notices issued by the Illinois Department of Public Aid to recipients of public assistance benefits informing them that their benefits were being reduced or terminated. 508 F.2d at 486–87. The notices read, in relevant part, "'The amount of assistance you receive for October, 1974, will be reduced to the amount shown on the enclosed card.'" *Id.* at 487. The notice explained that the reduction was "'because of changes in your needs or living arrangement which occurred between January 1, 1974, and the current month, but which were not entered on your record so as to effect [sic] your check.'" *Id.* No additional explanation of the reasons for the action was given. *Id.* The court found the notices to be inconsistent with the requirements of due process and held that a notice informing an applicant of a reduction or termination of benefits must "state the reasons for the proposed action." *Id.* at 490. The court reasoned that, in the absence of a reasoned explanation for the reduction or termination of benefits, "many of the mistakes that will inevitably be made will stand uncorrected" because of the "human tendency . . . to assume that an action taken by a government agency in a pecuniary transaction [(such as the calculation of welfare benefits)] is correct." *Id.*

One year later, in Banks, the Seventh Circuit elaborated more precisely the due process requirement, first articulated in Vargas, to inform applicants of the reasons for an adverse determination. Banks involved a reduction in benefits to existing recipients precipitated by a change to the method by which benefits were calculated. 525 F.2d at 839. The Illinois Department of Public Aid sent affected beneficiaries a notice informing them that their benefits would be reduced as a result of the change. *Id.* The notice stated that the recipient's benefits would be reduced and provided only the recipient's income, the benefit amount under the old method, and the benefit amount under the new method. *Id.* The court found the notice "deficient" under

v. Hegstrom, 590 F. Supp. 121 (D. Or. 1984); Baker v. State, Dept. of Health and Soc. Servs., 191 P.3d 1005 (Alaska 2008); *see also* Escalera v. N.Y.C. Hous. Auth., 425 F.2d 853 (2d Cir. 1970) (holding that due process requires detailed notice of the reasons for terminations of tenancies in the public housing context). The Sixth Circuit expressly declined to follow the Seventh Circuit's view of adequate notice in Garrett v. Puett, 707 F.2d 930, 931–32 (6th Cir. 1983), *aff'g* 557 F. Supp. 9 (M.D. Tenn. 1982). Garrett is best understood, however, as a so-called "mass change" case because the notices were precipitated by a legislative change to the program. Ortiz, 794 F.2d at 894; Baker, 191 P.3d at 1011 n.29. A distinction between "individual eligibility determinations" and "legislatively mandated substantive change[s] in the scope of [an] entire program" was explicitly recognized by the Supreme Court in Atkins. 472 U.S. at 129, 105 S. Ct. at 2528–29, 86 L. Ed. 2d at 92–93. There, the Court held that "the legislative determination provides all the process that is due" with respect to notice of the reasons for a deprivation caused by a "mass change" in the law governing an entitlement program like Food Stamps. *Id.* at 130, 105 S. Ct. at 2529, 86 L. Ed. 2d at 93 (internal quotation marks omitted).

Goldberg and Vargas because it "did not contain a breakdown of income and deductions so that recipients could determine the accuracy of the computations." *Id.* at 841–42. Without notice of the individualized factors (e.g., income, deductions, etc.) underlying the calculations, the court reasoned, recipients lacked protection against "agency error and arbitrariness." *Id.* at 842.

The Seventh Circuit reaffirmed Vargas and Banks in Dilda, holding that due process requires more than a statement of the "ultimate reason" for the adverse state action. 612 F.2d at 1057. The court rejected the notice proposed by the State in Dilda because it failed to provide the factual information underlying the components of the recipient's benefit amount reasoning that "'[u]nless the welfare recipients are told why their benefits are being reduced or terminated, many of the mistakes that will inevitably be made will stand uncorrected, and many recipients will be unjustly deprived of the means to obtain the necessities of life.'" Dilda, 612 F.2d at 1057 (quoting Vargas, 508 F.2d at 490).

We are persuaded that the Seventh Circuit's approach should be applied in this case. Providing affected individuals with notice explaining in detail the reasons underlying the state's adverse decision empowers individuals to protect their own interests and complements the state's efforts to achieve accuracy. "The touchstone of due process is protection of the individual against arbitrary action by government." Wolff v. McDonnell, 418 U.S. 539, 558, 94 S. Ct. 2963, 2976, 41 L. Ed. 2d 935, 952 (1974) (citing Dent v. West Virginia, 129 U.S. 114, 123, 9 S. Ct. 231, 233, 32 L. Ed. 623 (1889)). Toward this end, the Supreme Court has repeatedly singled out the right to a meaningful hearing as the most reliable bulwark against such arbitrariness. *See, e.g.*, Zinermon v. Burch, 494 U.S. 113, 127, 110 S. Ct. 975, 984, 108 L. Ed. 2d 100, 115 (1990); Mathews, 424 U.S. at 333, 96 S. Ct. at 902, 47 L. Ed. 2d at 32; Goldberg, 397 U.S. at 267, 90 S. Ct. at 1020, 25 L. Ed. 2d at 299. Yet, in the absence of an explanation of the reasons underlying the state's action, it is implausible to expect that an individual could prepare, let alone present, a sound defense. The inability to prepare a defense correspondingly undermines the effectiveness of any judicial remedy because it is less likely that a complete record of the issue will be developed for judicial review.[13] There is no second bite at the apple. The Constitution does not guar-

---

[13] Goldberg suggests that one of the primary functions of an administrative hearing is the development of a complete factual record and a comprehensive opinion explaining the agency's action to facilitate judicial review. *See* 397 U.S. at 267, 90 S. Ct. at 1020, 25 L. Ed. 2d at 298.

10

antee the right to *two* hearings.[14] Goldberg, 397 U.S. at 267 n.14, 90 S. Ct. at 1020 n.14, 25 L. Ed. 2d at 298 n.14 ("Due process does not, of course, require two hearings.").

With these principles in mind, we now turn to the actual notices at issue in this case. The brief explanations contained in the reason codes employed by the State fail to provide any insight into the factual bases for the State's adverse benefit determinations. The reason codes do provide *some* information to applicants in that the codes offer, in brief and general terms, the intermediate conclusions necessitating a denial. Yet, these are merely the "ultimate reasons" for the denial. Like the notices at issue in Dilda, 612 F.2d at 1056, the FSSA's notices fail to provide any explanation of *how* this "ultimate reason" was reached. Vargas, Banks, and Dilda make clear that a constitutionally adequate explanation must include the individualized factual bases underlying an adverse determination. *See* Dilda, 612 F.2d at 1057 (holding that a notice of adverse action is constitutionally inadequate if it lacks the individualized calculations underlying the benefit award); Banks, 525 F.2d at 842 (holding that due process requires notice of the individualized factors underlying an adverse determination); Vargas, 508 F.2d at 490 (holding unconstitutional a notice that lacked a reasoned explanation for an agency's adverse action).

Ortiz v. Eichler is instructive here. 616 F. Supp. 1046 (D. Del. 1985), *aff'd*, 794 F.2d 889 (3d Cir. 1986).[15] At issue in Ortiz were notices providing only "a one sentence explanation for the agency's action, such as, 'children's wages exceed eligibility limit,' or 'you are over the gross income eligibility limit,' or 'you did not provide a protective payee as requested.'" 616 F. Supp. at 1061 (citations omitted). In applying the Seventh Circuit's doctrine, the court held:

> At a minimum, due process requires the agency to explain, in terms comprehensible to the claimant, exactly what the agency proposes to do and why the agency is taking this action. If [the state] finds that a claimant has not performed some action that the regulations require, the notice must explain what the claimant was required to do and how his or her actions failed to meet this standard.

---

[14] The Due Process Clause requires a "fair hearing." Goldberg, 397 U.S. at 266, 90 S. Ct. at 1020, 25 L. Ed. 2d at 298. Presumably then, the state is required to provide a second hearing if the first was only cursory. *See id.* at 266–67, 90 S. Ct. at 1020, 25 L. Ed. 2d at 298–99. Here, however, the FSSA's notice of denial offers a "fair hearing" in the first instance.

[15] In affirming the District Court, the Third Circuit explicitly approved the District Court's analysis regarding the due process requirements for adequate notice. 794 F.2d at 894 ("We are persuaded that the district court's formulation was the product of thoughtful analysis supported by reasoned decisions in other courts.").

*Id.* at 1061–62. There is little difference between the notices struck down in <u>Ortiz</u> and the language of the reason codes at issue here. Neither "explain what the claimant was required by the regulation to do and how his or her actions failed to meet this standard." *Id.* Instead, each provides the applicant only with the predicate conclusions necessitating a denial of benefits. Due process requires that the notice provide the individualized reasons underlying this predicate conclusion.[16]

The State responds that the reason codes provided in the adverse action notices are only half of the picture. They argue that the notice to applicants should be understood to include not only the formal denial notices but also Form 2032, setting forth the specific documents needed to establish eligibility. They argue that, taken together, Form 2032 and the formal denial notices provide applicants "very specific notice . . . . [that] could hardly be in more explicit detail." [17]

---

[16] In determining the "specific dictates of due process," we must weigh (1) the private interest, (2) the risk of erroneous deprivation of such interest and the probable value of additional procedures in reducing that risk, and (3) the government interest. <u>Mathews</u>, 424 U.S. at 335, 96 S. Ct. at 903, 47 L. Ed. 2d at 33. Our analysis under the Seventh Circuit's reasoning is consistent with our own balancing of the <u>Mathews</u> interests: The individual interest at stake in the determination of eligibility for public welfare programs like Medicaid, Food Stamps, and TANF is unquestionably heavy given that the purpose of these programs is to supplement a person's ability to obtain basic necessities. By contrast, the government's interest is relatively minimal in terms of providing an explanation of the reasons for an adverse determination. Having evaluated an applicant's eligibility, the State necessarily already knows *why* it is denying benefits. All that is left for the State to do is communicate that explanation in its entirety to applicants. It is hard to imagine how this can be particularly burdensome in light of the fact that no additional effort on the part of the State is required to ascertain the reason for an adverse determination and given that the State already provides a written notice to applicants. Finally, the risk of erroneous deprivation is potentially high, especially because the State must rely heavily on the applicant to provide the information needed to establish eligibility. The individual applicant's ability to accurately provide the necessary documents is heavily dependent upon the specificity of the request made in Form 2032. The more general the request, the more likely it is that an applicant will fail to provide all of the necessary information, particularly in situations involving households with multiple persons. Thus, the provision of a more detailed explanation by the FSSA in a notice of adverse action will enable applicants to rectify any omissions that would otherwise lead to erroneous deprivations of benefits.

[17] The State's argument echoes the rationale employed by the trial court, which reasoned that the "multi-step process for eligibility determination" satisfies due process requirements. Findings of Fact, Conclusions of Law, and Summary Judgment, Appellants' App'x at 29. The trial court considered the "multi-step process" to include the following:

> [A]n initial interview, verbal instructions for what is needed to establish eligibility, written notice of what is needed to establish eligibility (the Form 2032), the availability of a toll free 1-800 number for assistance, the submission of the materials by the client, evaluation of the submitted materials, and, if the materials submitted by the client are inadequate to establish eligibility, a notice of adverse action.

*Id.*

Appellees' Br. at 17.  In essence, the State is arguing that an adverse action notice can include information provided to the applicant *before* the agency actually assesses the applicant's eligibility for the benefit.  We disagree that information communicated preceding the actual adverse determination can be considered in assessing the adequacy of the notice provided after such determination.

The State primarily relies on <u>Rosen v. Goetz</u>, 410 F.3d 919 (6th Cir. 2005), to support its argument that Form 2032 and the formal denial notices, when taken together, satisfy due process.  In <u>Rosen</u>, the State of Tennessee implemented a program aimed at reducing the fiscal impact of its supplemental Medicaid program, TennCare, which extended Medicaid benefits beyond the federally mandated minimum levels.  410 F.3d at 922.  To achieve the reduction, Tennessee decided to eliminate three of the seventeen TennCare eligibility categories, resulting in the disenrollment of 323,000 existing program beneficiaries.  *Id.*  At issue in the case was whether Tennessee's proposed disenrollment process complied with federal Medicaid regulations and the Due Process Clause of the Fourteenth Amendment.  *Id.* at 923.  The plaintiffs in that case challenged, among other things, the notices issued by Tennessee as violative of due process.  *Id.* at 931.  Like the plaintiffs in this case, the <u>Rosen</u> plaintiffs argued that the notices failed to provide sufficient explanation of the reasons for the termination.  *Id.*  When disenrolling existing beneficiaries under the reduction program, Tennessee first sent beneficiaries a "Termination Notice" and later sent a second letter that referenced the first notice and provided more information concerning the reason for the discontinuation.  *Id.* at 931.  The court rejected the plaintiffs' claim, holding instead that due process is satisfied where notice is made in two letters, not just one, at least where the first notice "references and brings to the attention of recipients" the second.  *Id.*

<u>Rosen</u> contemplates only a situation where *both* notices were provided *after* an adverse determination is made by the agency.  *See id.*  <u>Rosen</u> does not provide any guidance as to the permissibility of providing full notice in multiple correspondences where, like the State argues here, one portion of the notice *precedes* the making of the adverse determination.  Such amalgamated notice was rejected by the Alaska Supreme Court in <u>Baker v. State, Department of Health and Social Services</u>, where the Alaska Department of Health and Human Services argued that adequate notice, for purposes of due process, could include the written notice of adverse action

13

and the information applicants already had about the eligibility process and about themselves. 191 P.3d 1005, 1009 (Alaska 2008). The court reasoned that the agency "cannot presume that recipients already have a basis for understanding why services are being reduced; whatever information the department is required to provide must be part of the written notice itself." *Id.* at 1010. We agree. Merely offering applicants information from which they could potentially deduce the reasons for a denial is no process at all. Notice must be unambiguous so that applicants can know the precise reason for which they were denied benefits and can determine the accuracy of the State's determination. Form 2032 offers no additional information concerning the reasons for the State's decision in a particular case. It in no way *explains* the underlying reasons for the FSSA's denial of benefits. At best, Form 2032 aids the applicant in *deducing* the reasons for the denial, but it does not inform the applicant of the specific reason for the adverse determination.[18]

We therefore hold, as a matter of law, that the notices used by the FSSA to inform individuals that their applications for Medicaid, Food Stamp, or TANF benefits have been denied do not satisfy the requirements of due process. Accordingly, the Class A and Sub-class A plaintiffs were entitled to summary judgment on this issue, and the State's motion for summary judgment should have been denied.

## 2. Food Stamp Law

On cross-appeal, the State appeals the trial court's order enjoining the FSSA from "terminating, denying, or discontinuing the Food Stamp applications or benefits of the members of Class C based on an alleged 'failure to cooperate' with the agency."[19] Findings of Fact, Conclu-

---

[18] At oral argument before this Court, there was discussion about whether the presence of a 1-800 telephone number on the denial notices, where applicants could seek more information regarding the reasons for their termination, could satisfy the adequate notice requirement of due process. The ability to proactively inquire as to the reasons, however, has been unequivocally rejected by the Seventh Circuit as well as many other courts as an inadequate remedy for an otherwise deficient notice. Kapps, 404 F.3d at 126; Vargas, 508 F.2d at 489 ("Under such a procedure only the aggressive receive their due process right to be advised of the reasons for the proposed action."); Ortiz, 616 F. Supp. at 1062 ("[T]he burden of providing adequate notice rests with the state, and it cannot shift that burden to the individual by providing inadequate notice and inviting the claimant to call to receive complete notice."); Schroeder, 590 F. Supp. at 128. We agree that this is the correct view of due process.

[19] Class C challenges the FSSA's use of each of the codes challenged by Class A except for "Failure to submit medical information necessary to establish eligibility" and challenges two additional codes:

14

sions of Law, and Summary Judgment, Appellants' App'x at 37–38. The trial court held that the State could only deny an application for Food Stamp benefits on a finding that the applicant had "refused to cooperate." *See id.* Before the trial court, the Class C plaintiffs' only claim was that the State had improperly denied them Food Stamp benefits for failing to cooperate in the eligibility determination process because such a basis for denial is contrary to federal law. The plaintiffs made no claim that, even if "failure to cooperate" were a proper basis for denial, the State's "failure to cooperate" determination did not comply with the requirements of federal law. The State contends that federal law does "not prohibit the agency from denying benefits when a client has *failed to cooperate* by failing to supply necessary documentation for eligibility during the time frames established in the federal regulations." Appellees' Trans. Br. at 13.[20] We agree with the State's view of the relevant Food Stamp law.

Federal law states that "no household shall be eligible to participate in the [Food Stamp] program if it *refuses* to cooperate in providing information to the State agency that is necessary for making a determination of eligibility or for completing any subsequent review of its eligibility."[21] 7 U.S.C. § 2015(c) (emphasis added). It is simply not accurate, as the plaintiffs assert, that "federal law is *explicit*" that Food Stamp applications may only be denied where a household refuses to cooperate. Appellants' Opp'n to Trans. Br. at 11 (referring to 7 U.S.C. § 2015(c)). Section 2015(c) merely codifies the rather commonsense notion that a household is ineligible for Food Stamp benefits *if* it refuses to cooperate. Section 2015(c) does not attempt to comprehensively announce every basis on which a state *could* deny a household benefits. *See id.* Even so, had Congress intended to so limit the basis for denial, it could have done so easily. Congress could have said, for example, "A household shall be denied benefits *only if* it refuses to cooperate." Instead, Section 2015(c) employs a straightforward conditional statement to exclude any-

"Failure to complete a personal interview required to establish eligibility" (Code 585) and "Failure to return a signed redetermination form" (no three-digit code specified). Appellants' Br. at 12; Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Appellees' App'x at 365.

[20] On transfer, the plaintiffs argue that the State has waived this substantive argument because the State's only argument on cross-appeal was that the evidence designated by the plaintiffs to the trial court was insufficient to support summary judgment. We disagree. When reviewing an appeal of summary judgment, the case is before us as it was before the trial court. *See* Wilson, 929 N.E.2d at 202. Because the State properly raised this argument in its cross-motion for summary judgment, Response to Motion for Summary Judgment, Appellees' App'x at 398–99, the argument has not been waived.

[21] The Food Stamp program is also referred to as the Supplemental Nutrition Assistance Program ("SNAP"). *See generally* 7 U.S.C. §§ 2011–2036.

one who refuses to cooperate from eligibility for the Food Stamp program while leaving open other possible bases for disqualification. *See id.*

The Food Stamp program's implementing regulations contemplate both refusal and failure to cooperate as a basis of denial.[22]  Section 273.2(d)(1) of the Food Stamp regulations provides:

> If the household *refuses to cooperate* with the State agency in completing [the eligibility] process, the application shall be denied at the time of refusal.  For a determination of refusal to be made, the household must be able to cooperate, but clearly demonstrate that it will not take actions that it can take and that are required to complete the application process.  For example, to be denied for refusal to cooperate, a household must refuse to be interviewed not merely failing [sic] to appear for the interview.  *If there is any question* as to whether the household has merely *failed* to cooperate, as opposed to refused to cooperate, the household shall not be denied, and the agency shall provide assistance required by paragraph (c)(5) of this section.

7 C.F.R. § 273.2(d)(1) (emphasis added).  Section 273.2(d)(1) simply reaffirms the conditional language contained in Section 2015(c) of the statute and elaborates its meaning.  *See id.* ("*If* the household refuses to cooperate . . . , the application shall be denied at the time of the refusal." (emphasis added)).  This Section merely establishes a presumption that a household should be considered as having failed to cooperate *unless* there is no "question" that the household has refused to cooperate.  *See id.*  Again, the language of the presumption is conditional.  *Id.* ("*If* there is any *question* as to whether the household has merely failed to cooperate, as opposed to refused to cooperate, [*then*] the household *shall not be denied* . . . ." (emphasis added)).  As such, Section 273.2(d)(1) clearly contemplates at least *two* bases for the denial of benefits: refusal *and* failure to cooperate.  The key difference between the two grounds for denial created by Section 273.2(d)(1) is that the agency *must* deny benefits at the time the applicant refuses to cooperate. *Id.*

Our understanding of Section 273.2(d)(1) is guided by Section 273.2(h) which addresses

---

[22] Federal law directs the Secretary of Agriculture to "establish uniform national standards of eligibility . . . for participation by households in the [Food Stamp program]."  7 U.S.C. § 2014(b).  State agencies responsible for administering the program are prohibited from "impos[ing] any other standards of eligibility as a condition for participating in the program."  *Id.*

16

delays in eligibility determinations caused by the state or the household.[23] *Id.* § 273.1(h). Section 273.2(h)(2)(i) provides: "If by the 30th day [following the date an application is filed] the State agency cannot take any further action on the application *due to the fault of the household*, the household shall lose its entitlement to benefits for the month of application." *Id.* § 273.1(h)(2)(i) (emphasis added). A delay is considered the "fault of the household if the household has *failed to complete the application process* even though the State agency has taken all the action it is required to take to assist the household." *Id.* § 273.1(h)(1)(i) (emphasis added). "The State agency has the *option* of sending the household either a *notice of denial* or a notice of pending status on the 30th day." *Id.* § 273.1(h)(2)(i)(A) (emphasis added). Thus, where the applicant-household "fail[s] to complete the application process" (i.e., fails to cooperate) the state has the "option" of either denying the application or allowing the application to remain pending, with notice to the household accordingly. *Id.* This interpretation is buttressed by Section 273.10(g)(1)(ii), which expressly acknowledges the power of the state agency to *"elect*[] to use a notice of denial when a delay [is] caused by the household's failure to take action to complete the application process [(i.e., fails to cooperate)]." *Id.* § 273.10(g)(1)(ii) (emphasis added). The interpretation urged by the plaintiffs' would ignore these provisions altogether.[24]

For these reasons, we hold that federal law permits the FSSA to deny benefits to applicant's who fail to cooperate in the eligibility determination process. We therefore reverse the trial court's grant of summary judgment to the plaintiffs on this issue.[25]

---

[23] Section 273.2(h) applies only to initial applications for benefits; Section 273.14(e) addresses delays during the recertification process. 7 C.F.R. §§ 273.2(h), 273.14(e). Because the two are substantially similar in language and effect, we deal only with Section 273.2(h) for simplicity.

[24] When the applicant refuses to cooperate, Sections 273.2(d)(1) and (c)(5) require that the state provide the applicant with a notice that "inform[s] the household of the State agency's responsibility to assist the household in obtaining required verification." 7 C.F.R. §§ 273.2(c)(5), (d)(1). Where the applicant only fails to cooperate, the state must comply with Section 273.2(h)(1)(i). *Id.* § 273.2(h)(1)(i).

[25] Because we hold that federal Food Stamp law permits the State to deny benefits when an applicant fails to cooperate, the State has properly notified class members of the standard on which their eligibility determinations were based. Thus, we need not address the plaintiffs' claim that the State has violated the due process clause, under the reasoning of Thompson v. Roob, No. 1:05-cv-0636-SEB-VSS, 2006 WL 2990426 (S.D. Ind. Oct. 19, 2006).

### 3. Sheila Perdue

The State also challenges the trial court's determination that the FSSA violated Sheila Perdue's rights under the ADA and the RA. In seeking summary judgment, Perdue challenged the FSSA's administrative policy decision not to assign specific case-workers to applicants to help them navigate the application and recertification processes. Perdue alleges that this policy disproportionately impacts disabled individuals and constitutes a failure to accommodate her disability in violation of Title II of the ADA (42 U.S.C. §§ 12131–12165) and Section 794 of the RA. The State contends, however, that Perdue has failed to designate sufficient evidence to support summary judgment. Specifically, the State makes three arguments: (1) Perdue failed to provide evidence establishing that she is "deaf or that her disability was known to the agency"; (2) Perdue failed to designate evidence establishing that "but for her disability, she would have received the benefit being sought"; and (3) Perdue "did not designate any evidence that established that the [FSSA] intentionally discriminated against Perdue, or refused to provide a reasonable modification to Perdue, or that the rule in question had a disproportionate impact on Perdue as a disabled person." Appellees' Cross-Appeal Br. at 36, 38 (emphasis omitted). We agree with Perdue that the FSSA was required to reasonably accommodate her disability under the ADA and RA.

Perdue alleges the following facts in her verified complaint, which she designated as evidence in her summary judgment motion: Perdue had been receiving Food Stamp and Medicaid for the Disabled benefits for three or four years. In December 2007, the FSSA notified her that she must be recertified for these programs in order to continue receiving benefits. As part of the recertification process, she was required to participate in a telephonic interview. Perdue timely appeared for the interview. Because she was having difficulty hearing the interviewer over the telephone, she asked the interviewer if she could schedule an in-person interview. The interviewer told her that she could not. Perdue then gathered her paperwork and traveled to a nearby FSSA Help Center where she requested assistance completing her recertification forms. None was provided. Perdue then completed the forms herself to the best of her ability and submitted them. The State has offered no competing facts.

18

Title II of the ADA prohibits discrimination against the disabled by "public services."  42 U.S.C. §§ 12131–12165.  Section 12132 of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  *Id.* § 12132.  ADA regulations require a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7).  Such modifications are required "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  *Id.*  Similarly, Section 794 of the RA provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  The RA's accompanying regulations also mandate that a covered entity "shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the [covered entity] can demonstrate that the accommodation would impose an undue hardship on the operation of its program."  28 C.F.R. § 41.53.

As outlined in the preceding paragraph, to sustain a claim under either the ADA or the RA, Perdue must demonstrate that (1) she is a "qualified individual with a disability" (2) who was excluded from or denied the benefits of the services, programs, or activities of, or otherwise subjected to discrimination (3) by a public entity (4) by reason of her disability.  42 U.S.C. § 12132; 29 U.S.C. § 794(a).[26]  The State does not dispute, nor could it, that the FSSA is a "pub-

_____

[26] The requirements imposed on state and local government services by Title II of the ADA and Section 794 of the RA are generally the same, although some differences, which are not relevant here, have been recognized.  42 U.S.C. § 12201(a) ("Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title."); Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003) ("[U]nless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically."); Baird ex rel. Baird v. Rose, 192 F.3d 462, 468–69 (4th Cir. 1999) ("The ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts.  But they differ with respect to the "causative link between discrimination and adverse action."); *see also* Bragdon v. Abbott, 524 U.S. 624, 631–32, 118 S. Ct. 2196, 2202, 141 L. Ed. 2d 540, 553 (1998) (Section 12201(a) of the ADA "requires us to construe the ADA to grant at least as much protection as provided by

lic entity." *See* 42 U.S.C. § 12131(1)(A), (B) (A "public entity" is "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or local government."). Nor does the State dispute that Perdue was denied Food Stamp and Medicaid benefits by the FSSA. Instead, the State challenges Perdue's status as a "qualified individual with a disability" and that Perdue was excluded "by reason of" her disability.

As an initial matter, based on the facts presented, there is no issue of material fact that would support the State's argument that Perdue was denied benefits "by reason of" her disability. While there doesn't appear to be any evidence of intentional discrimination, the FSSA clearly did not provide any accommodations to Perdue to assist her in applying for benefits, and this failure to accommodate disproportionately impacted this plaintiff as a disabled person. The fact that she was unable to participate in the telephone interview alone places a heavier burden on the disabled.

Perdue has designated sufficient evidence to support a finding that she is disabled. The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities" and includes hearing among major life activities. *Id.* § 12102(1)(A), (2)(A). In her deposition, Perdue stated that she has seventy percent nerve damage in both of her ears for which she regularly wears hearing aids. She stated that she does not hear well over the telephone and cannot hear people talking at all without her hearing aids. Based on this evidence, there is no issue of material fact that Perdue is disabled within the meaning of the ADA.

Lastly, there is no issue of material fact as to whether Perdue is a "qualified individual with a disability." Under the ADA, a "qualified individual with a disability" is "an individual

---

the regulations implementing the Rehabilitation Act."); <u>McPherson v. Mich. High Sch. Athletic Ass'n, Inc.</u>, 119 F.3d 453, 459–60 (6th Cir. 1997) ("In short, the principal distinction between the two statutes is that coverage under the Rehabilitation Act is limited to entities receiving federal financial assistance, while the ADA's reach extends to purely private entities. There may be other differences in the application of the two statutes, including whether the 'solely by reason of . . . disability' standard made explicit in the language of the Rehabilitation Act should be imported into the ADA, which contains no such language."); *see generally* <u>Wis. Comm. Servs., Inc. v. City of Milwaukee</u>, 465 F.3d 737 (7th Cir. 2006) (concluding that case law developed under Section 794 of the RA is applicable to Title II of the ADA and vice versa). As such, we address Perdue's claims under the ADA and RA simultaneously as a single claim.

with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). This determination is inextricably linked with the determination of whether the denial, exclusion, or discrimination was "by reason of such disability." Alexander v. Choate, 469 U.S. 287, 300 n.19, 105 S. Ct. 712, 719 n.19, 83 L. Ed. 2d 661, 671 n.19 (1985) (discussing the identical requirements of the RA: "However, the question of who is 'otherwise qualified' and what actions constitute 'discrimination' under the section would seem to be two sides of a single coin; the ultimate question is the extent to which a [public entity] is required to make reasonable modifications in its programs for the needs of the handicapped."). Both the ADA and the RA seek to "assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from [covered] programs." *Id.* at 304, 105 S. Ct. at 721, 83 L. Ed. 2d at 674. Accordingly, a public entity is not "required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, [but] it may be required to make 'reasonable' ones," which includes providing otherwise qualified disabled individuals with "meaningful access" to its benefits. *Id.* at 300, 105 S. Ct. at 720, 83 L. Ed. 2d at 671.

The parties disagree about the precise benefit for which Perdue must be "otherwise qualified." On the one hand, a plaintiff "must show that, 'but for' [her] disability, [she] would have received the ultimate benefit being sought" in order to maintain a claim under the ADA or RA. Wis. Comm. Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 755 (7th Cir. 2006). Thus, the State contends, Perdue must demonstrate her eligibility to receive the Food Stamp and Medicaid benefits for which she was applying at the time of the alleged violation. On the other hand, Perdue argues that any entitlement to benefits she might have is meaningless unless she is able to meaningfully participate in the application process. As such, Perdue contends that she must only demonstrate her eligibility *to apply* for Food Stamp and Medicaid benefits to satisfy the "otherwise qualified" requirement. We are persuaded that Perdue is correct and do not believe that the accommodation requirements of the ADA and RA were intended to operate so rigidly as the State would have us conclude.

In Choate, the Supreme Court admonishes us that we should not define the benefit—for which a disabled individual must show they are "otherwise qualified"—in a manner that "effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled . . . ." 469 U.S. at 301, 105 S. Ct. at 720, 83 L. Ed. 2d at 672. Were we to define the benefit so narrowly as to encompass only the individual's actual entitlement to Food Stamp or Medicaid benefits, the FSSA would only be required to reasonably accommodate disabled applicants who could demonstrate that they are eligible for benefits *before* applying for benefits. But this would be placing the cart before the horse. The entire purpose of the application process is to determine the applicant's eligibility. If disabled applicants first had to demonstrate their eligibility for the program before the agency was required to accommodate them, they would be right back in the same situation that gave rise to this case in the first place. The agency would have to establish a process for verifying disabled applicants' eligibility before the agency would be required to provide reasonable accommodations to assist disabled applicants with the application process. In effect, the agency would have to establish an eligibility process for disabled individuals to receive accommodations for the eligibility process. This would be absurd and cannot have been the result intended by Congress. Perdue's claim is premised wholly on the notion that she needs assistance *with the application process* on account of her disabilities. If she is unable to meet the requirements of the application process without accommodations, she would not be more able to demonstrate to the FSSA that she is entitled to reasonable accommodations because she is otherwise eligible for Food Stamp and Medicaid benefits. Because the FSSA does not know *before* an applicant's eligibility is determined whether a disabled individual is legally entitled to benefits, it must reasonably accommodate all disabled individuals during the *application process* so as not to inadvertently burden qualified disabled applicants. Perdue has designated sufficient facts to support a finding that she was denied meaningful access to the FSSA's programs because anyone is eligible to apply for Food Stamp and Medicaid benefits.

Having concluded that the FSSA violated Perdue's rights under the ADA and RA, the trial court ordered the FSSA to provide her with a "caseworker or case management services." Findings of Fact, Conclusions of Law, and Summary Judgment, Appellants' App'x at 38. The trial court's order was premised on the Second Circuit's conclusion in Henrietta D. v. Bloomberg, that the case management system utilized by New York City in that case represented a reasona-

ble accommodation. *Id.* at 36 (citing 331 F.3d 261, 280 (2d Cir. 2003)). Henrietta D., however, does not stand for the proposition that a case management system is the *only* reasonable accommodation sufficient to accommodate disabled applicants for social services. It stands only for the proposition that such a system is a *sufficient* reasonable accommodation. 331 F.3d at 280. The ADA and RA only require that the FSSA provide meaningful access to the disabled unless such "reasonable accommodation . . . would impose an undue hardship on the operation of its program." *See id.*, 331 F.3d at 281–82 (citing 28 C.F.R. § 41.53). Thus, the FSSA is not required to adopt any specific form of accommodation such as a caseworker or case management services. Rather, the FSSA is only required to make reasonable accommodations sufficient to accommodate the disabled.

**Conclusion**

Summary judgments in favor of the State as to Class A and Sub-class A and in favor of the plaintiffs as to Class C are reversed, and summary judgment in favor of Sheila Perdue is affirmed in part. With respect to Class A and Sub-class A, we grant the plaintiffs' motion for summary judgment and hold that the notices used by the FSSA to inform applicants that they have been denied Medicaid, Food Stamp, and TANF benefits are unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution because they fail to sufficiently explain the reasons underlying the agency's adverse determination. On this issue, this case is remanded to the trial court to adjudicate the plaintiffs' related claims for relief. With respect to Class C, we reverse the grant of the plaintiffs' motion for summary judgment and hold that federal law permits the FSSA to deny an application for Food Stamp benefits when the applicant fails to cooperate in the eligibility determination process. With respect to Sheila Perdue, we affirm in part the trial court's grant of Perdue's motion for summary judgment to hold that she is entitled to reasonable accommodation, but we decline to require that the State necessarily must provide a caseworker or case management services.

Shepard, C.J., and Sullivan, Rucker, and David, JJ., concur.

23